## SMITH v. HOVLAND.*

(Circuit Court of Appeals, Ninth Circuit. February 15, 1926. Rehearing Denied March 22, 1926.)

No. 4366.

1. Courts ⬤➡405(16)—Petition for certiorari and for diminution of record not filed until two terms of court had passed, and motion to join additional parties, will be denied (C. C. A. Rule 18).

Where petition for certiorari and for diminution of record was not filed until after two terms of Circuit Court of Appeals had passed, and no satisfactory cause was shown for not having moved promptly under C. C. A.

*Certiorari denied 46 S. Ct. 638, 70 L. Ed. ––.

Rule 18, held, that parties were bound by record as stipulated by counsel, and petition will be denied and motion to join additional parties overruled.

2. Appeal and error ⬤➡931(10), 1022(1).

Master's findings confirmed by trial court are presumptively correct, and, in absence of obvious error in applying law or serious mistake in considering evidence, will be permitted to stand.

3. Partnership ⬤➡333—Partner held entitled to credit for value of property turned over to firm without reduction because of litigation then pending affecting title.

In partnership accounting suit, partner was entitled to credit for value of property turned over to partnership without reduction, because when partnership was formed litigation was pending over title which reduced its value, where such litigation failed to impair title.

4. Partnership ⬤➡333—Partner who retained proceeds of sale of firm property after dissolution of firm held chargeable with interest thereon.

Partner, who retained proceeds of sale of firm property, which he received five years after dissolution, held chargeable with interest thereon, notwithstanding he sued for accounting soon after paying out certain sums in settlement of firm debts due to himself personally.

5. Partnership ⬤➡282, 333.

After dissolution, either partner may sell firm property and use proceeds to pay firm debts, but if he withholds proceeds he is chargeable with interest.

Appeal from the District Court of the United States for the District of Arizona.

Suit by Hoval A. Smith against Henry B. Hovland. From a decree entered on the master's report, both parties appeal. Decree modified, and, as so modified, affirmed.

Suit in equity commenced by Smith against Hovland April 11, 1917, for an accounting and settlement of the partnership affairs of Hovland & Smith. After issues were made up, the court referred the cause to the standing master to hear and determine all of the issues of law and fact, state an account between the parties, to make findings of fact and conclusions of law, to make a report to the court, and generally to exercise such powers as might be exercised by a master in chancery of the court.

The findings, so far as material to these appeals, were in substance as follows: By a verbal contract the parties agreed that as of January 1, 1905, they would become partners in the business of examining and dealing in mining properties and real estate, acquiring and disposing of options and contracts for leasing, purchase, development, and operation of mines, mining properties,

or real estate; and in the promotion of corporations for the purchase, sale, development, and operation of mines, and of acquiring, managing, and disposing of shares of stock of such corporations, and engaging in such other enterprises as might be agreed upon between the partners. Each was to have a half interest and contribute equally to the capital assets and to exercise equal authority. Property then or thereafter held or acquired in the name of either party was to be held and disposed of for the use and benefit of the partnership. Smith was to contribute to the capital his interest in the Arizona King group of mines together with his interest in certain other mining properties at the then reasonable value thereof, and also his equities, rights, and options in certain mining claims at the then reasonable value thereof. These mining claims, options, and commission rights are found to have become partnership property and were treated as such. The partnership books of account were kept in the name of Smith at Bakerville, Ariz. They recorded all sums of money received and expended by the partnership or either of the partners for it, but no credit to Smith was made or entered on account of Smith's contribution to the partnership of his half interest in the Arizona King group of claims, or on account of the equities, rights, and options hereinbefore mentioned, and no agreement was ever made between the parties fixing the exact amount to be credited to Smith for such contributions.

In 1905 the partnership aided in the promotion of the Warren Realty & Development Company. In that matter in consideration of $38,000 and the issue of 8,000 shares of paid-up stock of the Warren Company, the Bisbee Copper Development Company relinquished to the Warren Company all of the interest of the Bisbee Company in certain options and properties which the Bisbee Company had theretofore secured from Smith, including the Union group of mines. Smith waived certain prospective profits, equities, and commissions under the options, thus permitting the Warren Company to buy the property held by the Bisbee Company at a much lower price than that which the Bisbee Company would have had to pay under its option, and as a result of the transaction the partnership realized profits of approximately $40,000, and Smith conveyed his interest in the East Bisbee group of mines to the Warren Company for $15,000 which was received by the partnership and credited to Smith on the partnership books.

The master found that Smith was entitled to a credit for the reasonable value of the equities and options and commissions as of March 1, 1905. As a result of the promotion of the Warren Company, Smith for the benefit of the partnership received from the Warren Company an option to buy 6,000 shares of the capital stock of the Warren Company at $15 per share, and thereafter, with the consent of the partnership, he conveyed 2,000 shares to one Cole, 2,000 shares to defendant, and 2,000 shares to himself, which shares remained the personal property of those three persons.

Until June, 1910, the half interest in the Arizona King group of mines was held by Smith for the benefit of the partnership. About that time the Union Mines Company was organized by the partnership to take over the titles to the Arizona King group and certain other claims which had been acquired by the partnership, titles to which had been in the name of Smith. Thereupon Smith conveyed all of said interest and properties to the Union Mines Company and received 21,000 shares of the capital stock which was carried in his name until transferred in 1912 to one Shattuck as security for partnership debts owing to Shattuck and other creditors.

During the existence of the partnership, Hovland contributed approximately $227,000 and Smith $113,000, in addition to the contribution of his interest in the Arizona King group and his equities, options, and rights already referred to. No claim for interest on the sums advanced to the partnership was ever made until February, 1912, when Hovland claimed interest.

In 1908 Hovland, for the benefit of the partnership, secured an option to buy the Live Oak and certain other mining properties in Arizona, and the partnership proceeded to promote the Live Oak Development Company to which Hovland, for the benefit of the partnership, transferred his options and property rights for $10,000; and in further consideration of an option granted by the Live Oak Company to Hovland for the benefit of the partnership, an agreement was made to purchase 15,000 shares of the capital stock of the Live Oak Company. The option was subject to the condition that if development work proved the existence of a mine any portion of the 15,000 shares then unissued should be forthwith issued and delivered, full paid, to Hovland. Prior to November 27, 1909, out of the 15,000 shares covered by the option, 3,038 were issued to Hovland or his order.

These shares were partnership property when received by Hovland and were disposed of by him, but it is found that he did not account to the partnership for them and had not been debited on his account therefor.

Prior to November 27, 1909, Smith, for the use and benefit of the partnership, exercised the option to the extent of 962 shares of Live Oak stock which was sold by him at a profit of $6,891.87, all of which money Smith turned over to the partnership and devoted to its use, one half thereof being credited to Hovland and the other half to Smith. About that time it was demonstrated that there was a mine in the Live Oak property, and it was ordered that the remaining unissued stock covered by the option (11,000 shares) should be and the same was issued to Hovland. These 11,000 shares were property of the partnership and were so received and held by Hovland.

In January, 1911, at Duluth, the partners met and discussed their affairs, but at that time there was no agreement of dissolution and no·meeting of minds as to ownership or distribution of the assets. After the Duluth meeting relations became unfriendly, and on February 11, 1912, at Chicago, each partner presented a statement. Hovland claimed interest on the amounts contributed by him and credit for certain stock alleged to have been purchased for the benefit of the partnership. Smith disputed the claims, and thereafter on March 1, 1912, notified Hovland that from that date the partnership was dissolved, that firm debts should be promptly paid out of firm property, and that thereafter the assets should be divided. Smith specially objected to Hovland's claim for interest on contributions to firm capital and to his claim that certain stock purchases other than Live Oak stock allotments were copartnership ventures. Smith claimed that 4,400 shares of Warrior Development stock and the 11,000 shares of Live Oak stock and the profits from sales of such stock were firm property to be accounted for by Hovland.

The partnership was dissolved on March 1, 1912. In that year the Union Mines Company property was sold for $97,500 cash, which was paid to Shattuck as trustee to secure the debts owing by the partnership to him and to a bank. Any balance was to be held by Shattuck for the benefit of the creditors of Hovland & Smith, to be paid on joint approval.

In 1910 Smith, with Hovland's knowledge and consent, managed certain litigation between the United States and the Warren Development Company and Hovland & Smith wherein the United States sought to cancel certain patents which had been issued to the property belonging to the Warren Company. Smith went to Washington in December, 1910, and procured a dismissal of the suits for which services he was allowed certain sums by the Warren Company as compensation, which sums, it is found, he should account for to the partnership, less costs and expenses incurred in the performance of his services.

When the partnership was dissolved, it owned the Rough Rider group of mines for which applications for patents were then pending. Smith at his own expense remained in Washington and obtained patents to those claims, for which service it is found he is entitled to $12,000 as reasonable compensation.

In April, 1917, Smith negotiated and consummated a sale of the Rough Rider group to the Phelps-Dodge Corporation for $200,000, of which amount he received $100,000 upon delivery of conveyances. Out of this sum he discharged all the partnership debts except one claim and an unliquidated account. Thereupon he brought the present suit. By the terms of the Rough Rider sale agreement, the balance of the purchase price ($100,000) was to be paid by the purchaser if and when the conveyance made and delivered by Smith to the Phelps-Dodge Corporation and the title to be conveyed thereby shall be approved and confirmed by Hovland individually and as a member of the partnership, or if and when the conveyance and the title shall be finally confirmed and validated by judicial decree in any litigation brought for the settlement of the partnership affairs of Hovland & Smith. But some months before the sale, to wit, February 28, 1917, the Rough Rider group was sold under execution directed against Smith, in whose name the partnership title was held. This sale was pursuant to a judgment in the state court in Arizona wherein the judgment creditor sought to collect certain debts of the partnership. Immediately after the instant suit was filed by Smith Hovland filed a petition praying for an order restraining Smith from collecting upon the sale of the Rough Rider group, and in the alternative, if Smith had completed the sale and collected, to restrain him from disposing of the proceeds and requiring him to pay the money into court. Restraining order was issued, but nothing in the order was to prevent Smith from making conveyance pursuant to

the contract of sale theretofore provided the purchaser should pay the balance of the purchase price into court. As a matter of fact, Smith had consummated the sale and delivered the conveyance and had received the $100,000 before the restraining order was issued. The master finds that the sale should now be confirmed and the purchaser should pay the balance into court to await further orders.

Between December 22, 1914, and June 27, 1916, Smith out of his own funds paid taxes and for assessment work for which he is entitled to credit. He is held accountable for the $100,000 received on account of the sale of the Rough Rider group and should be credited with sums paid out of that sum on account of partnership debts, and for any sums he may have paid since the dissolution of the partnership in satisfaction of partnership debts, and should be charged with interest on the sum remaining of the $100,000 since its receipt by him. The partnership books kept at Bakerville are found to be a proper basis for the account.

Hovland asserted that he bought certain shares of stock in mining and other companies at a cost of $158,000 for the benefit of the partnership and asked credit accordingly. The master found that in view of the fact that partnership books failed to show a credit to Hovland for the purchase of such shares, they have always been his individual property and should not be charged to the partnership.

It is found that in January, 1911, Hovland without right treated the Live Oak stock belonging to the partnership as his individual property and made contracts concerning the same without the consent or knowledge of Smith, and exchanged the partnership Live Oak stock for stock in the Inspiration Copper Company at the rate of two shares of Inspiration for one of Live Oak, and caused the Inspiration stock to be issued in his (Hovland's) name, and thereafter, in disregard of the rights of the partnership, pledged the Inspiration stock to secure a loan of $300,000 in New York for his personal use, and that the action of Hovland caused a loss of the stock through foreclosure of the pledge thereof, and that Hovland should account for all of the Live Oak stock and Inspiration stock belonging to the partnership, and should pay into court for the benefit of the partnership the value of the stock at the time of the filing of this suit, with interest and all dividends with interest, or should purchase and deliver proper certificates of such number of shares of

Inspiration stock as may be found owing from him to the partnership, and should reimburse the partnership for dividends which have been paid since the organization of the Inspiration Company up to the time of the filing of this suit or should respond in damages to be ascertained upon accounting; that Hovland should be credited in the accounting for moneys paid by him in satisfying a judgment recovered against him by one Fairchild for failure to deliver to Fairchild 1,000 shares of Live Oak stock; that Hovland must account for 5,000 shares of the capital stock of the Warrior Development Company received by him for the benefit of the partnership; and that a claim made by one Fox for services rendered to Smith in connection with the Rough Rider group is a partnership liability to pay which sufficient sums should be retained.

The master reported Smith entitled to net credits of $187,460.76, and Hovland's net debits as $1,072,214.62.

Many exceptions were filed, and after elaborate argument the District Court held that the master had reached a correct conclusion as to the facts and that the facts as found by the master were such as would have been found by the court. But the learned judge disagreed with the master in respect to 7,850 shares of Live Oak stock which Hovland was held to be accountable for to the partnership. These 7,850 shares or 15,700 shares of Inspiration, their equivalent, were considered by the master as of the market value of $56 per share on April 11, 1917, the date of the filing of the complaint in this suit. The dividends which the master found Hovland would have received upon those shares up to that date, if they had remained in his possession, amounted to $145,225. The master added interest to these amounts at the rate of 6 per cent. from April 11, 1917, to November 1, 1921, when the master's report was filed, making a total charge for Live Oak stock of $1,305,041.11. The court was of the opinion that, inasmuch as the property belonged to the partnership and that inasmuch as it had been agreed between the partners that property acquired in the name of either should be held and disposed of for the use and benefit of the partnership subject only to the duty of the partner holding title to account to the partnership, it was not the duty of Hovland in March, 1912, to hold the stock and account for it to the partnership in kind, but that he had a right to dispose of it for the benefit of the partnership and to account, and that not only was it the right of

Hovland to dispose of it, but it was his duty to do so "as it was the only partnership asset immediately available for the payment of partnership debts." It was therefore held that Hovland did not incur more than a partner's liability, notwithstanding the fact that he assumed to dispose of it as an individual, and that he should be held accountable for the highest price received by him when the stock was sold, or $16.25 a share, and that upon the amount received on that basis he should be charged with interest from March 18, 1914, until the date of the decree. Thus the debits of Hovland to the partnership on the Live Oak stock as of April 12, 1922, were reduced from $1,305,041.11 to $378,605.50. With such modification and an item of $15 costs, decree was made, approving the findings of the master and his conclusions of law. The court appointed a special master and directed him to proceed to execute the provisions of the decree, and retained jurisdiction to make any orders that might seem proper in equity. Appeals and cross-appeals were taken.

Ellinwood & Ross, John E. Sanders, and John M. Ross, all of Bisbee, Ariz., for appellant and cross-appellee.

John H. Campbell, S. L. Kingan, and A. R. Conner, all of Tucson, Ariz., and Charles C. Montgomery, of Los Angeles, Cal., for appellee and cross-appellant.

Charles R. Morfoot, of Los Angeles, Cal., for Hovland.

Before HUNT, RUDKIN, and McCAMANT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above. [1] Nearly a year after the record was filed in this court and during the term at which the case was set for hearing, Hovland filed a petition for certiorari and for diminution of record based upon the ground that Smith was and is not the sole party in interest; that Phelps-Dodge Corporation and others are necessary parties and should be joined; and that certain papers used in a case pending in the state court of Arizona and an interlocutory decree entered January 30, 1922, in the United States District Court for the District of Arizona in the present case and a stipulation on which the interlocutory decree was entered should be certified to this court. The petition is signed by Hovland by Charles R. Morfoot. Mr. Morfoot does not appear as attorney of record in the appeal proper, and upon the hearing before us counsel of record

for the appellant disclaimed any participation in the matter of the petition.

Examination of the record on appeal shows that the contents of the transcript to be filed in this court for the purposes of Hovland's appeal and of Smith's cross-appeal were settled by stipulation of the parties through their respective counsel of record and by order of the District Court dated August 13, 1924, and subsequent stipulation and order dated October 8, 1924, and also that as far back as January, 1922, the principal facts upon which Hovland now relies as grounds for his petition were matters of record in the case. Two terms of this court passed after this appeal was filed, yet no petition for certiorari was made as required by rule 18 of the court, and no satisfactory cause is shown for not having moved promptly in the premises. We therefore hold that the parties are bound by the record as stipulated by their counsel, and deny the petition for certiorari and diminution of record, and overrule the motion to join additional parties.

[2] To enter upon an extended statement of the evidence upon the merits would greatly lengthen this opinion, and is unnecessary. The findings of fact, having been approved by the District Court after a review of the evidence, are to be taken as presumptively correct, and unless obvious error has intervened in applying some principle of law or some important mistake has occurred in weighing the evidence, the decree will not be reversed. Furrer v. Ferris, 12 S. Ct. 821, 145 U. S. 132, 36 L. Ed. 649; Road Imp. Dist. v. Wilkerson (C. C. A.) 5 F.(2d) 416. We shall refer briefly to the more important features.

Hovland's contentions are that the master and the court erred: (1) In allowing Smith a credit of $30,000 on account of the Arizona King group of mining claims; and (2) in allowing him a credit of $139,497.66 or any other sum as the value of certain options and commissions; (3) in finding that the partnership was dissolved as of March 1, 1912; (4) in finding that on March 1, 1912, Hovland had 7,850 shares of Live Oak stock and that certain stocks were purchased by Hovland for himself and not for the partnership.

Smith by cross-appeal predicates error (1) upon a charge to him of interest amounting to more than $22,000 on part of a sum received by him for the sale of the Rough Rider claims; (2) upon the decision of the court disaffirming the finding of the master allowing a debit to Hovland of $1,305,041,

on account of Hovland's acts connected with 15,700 shares of Inspiration, and that in lieu of the debit in said sum Hovland should be debited with $378,605.50.

[3] It appeared that in 1904 the company which owned the Arizona King group of claims failed to do the necessary assessment work and in January, 1905, two men, strangers to this litigation, located the claims. Thereupon Smith and the two locators agreed that Smith was to assure payment for doing necessary work and was to have a half interest in the claims. After the firm of Hovland & Smith was formed, the partnership bought some interests in the group, and eventually the claims were patented to the two strangers and Smith, and Smith conveyed all of his interest in the Arizona King group to the Union Mines Company, the entire capital stock of which was owned by Hovland & Smith. In 1912 the Union Mines Company sold its interest in the group for $100,000 which sum was applied to the payment of partnership debts. It appeared, however, that payment to the men who did the assessment work for 1904 was made by a partnership credit entered on the partnership books (which were kept in Smith's name) in March, 1906. The master did not overlook the bearing that the book entry might have as tending to support Hovland's testimony to the effect that before the partnership of Hovland & Smith was created Hovland told Smith he would join him in the purchase of the Arizona King group, but considering the fact that when the strangers made their location there was no partnership of Hovland & Smith, and that prior to March, 1905, the locators dealt with Smith alone, it was concluded that entry for doing the assessment work made upon the books was in reality a payment of Smith's individual obligation incurred in 1904 and should have been charged against Smith on the partnership books. It was further found that when the partnership was formed it became owner of a half interest in the group, title to which, however, was then involved in litigation. The master estimated the value of Smith's interest in the group when he turned it over to the partnership at $40,000, but because of the litigation over the titles he reduced the value to $30,000. We think there should be a modification of this credit, and that Smith's valuation of $40,000 should be accepted without reduction of the twenty-five per cent. This seems equitable in the light of the fact that the litigation failed to impair the titles.

The credit allowed Smith as the value of certain options and equities in certain properties rests upon evidence that Smith individually owned the options and equities before the partnership was formed, that the rights were very valuable, that he relinquished them in favor of the partnership and for its financial benefit. One of the principal matters concerning this credit was the partnership promotion and development of the Warren Realty & Development Company in which in 1905 the firm spent approximately $600,000 in buying certain properties, which in 1917 were sold for over $2,000,000. But back in 1903 many of the properties which went into the Warren Company were held by Smith under options to purchase. By such options, if availed of, Smith would have received about $130,000 in cash, and the partnership, by promotion of the Warren Company, was enabled to buy the properties less the commissions Smith was entitled to. The master thought it just to give Smith credits against the partnership as of March 1, 1905. Whether the value of Smith's rights in the options was worth the sum for which he was given credit was vigorously questioned, but there was ample evidence to support the finding, and it will not be disturbed.

With respect to certain shares and purchases of stock other than Live Oak included in an account submitted by Hovland to Smith in February, 1912, Hovland took the position that the stocks were bought as partnership property, whereas Smith contended that the purchases were Hovland's individual matters and therefore should be kept out of the partnership accounts. Much conflicting testimony was introduced. Smith testified that he never had possession of any of the shares involved, and the master, after sifting the mass of evidence, both oral and documentary, concluded that Hovland treated the stocks as his own and that they belonged to him. An attentive reading of the testimony leads to the view that the letters and acts of the partners were consistent with that conclusion, and that the finding was correct.

The master, however, was right in treating as partnership stocks Parea Oil shares, which at Hovland's request were taken from his personal safety box to be sent to Hovland at Duluth, for it is clear that the partnership was interested in Parea Oil and that shares in that company were issued to each partner. Hovland was therefore correct in claiming credit for the value of such shares, and Smith was right in not disputing the credit.

A large part of the conflicting evidence was addressed to what was the true date of the dissolution of the partnership, whether as of March 1, 1912, as Smith contended, or January 17, 1911, as Hovland stated. It is sufficient to say that the finding of the master and the court is amply sustained; hence the accounting was properly made with respect to March 1, 1912.

[4] Smith's contention that the master erred in charging interest against him on the unexpended balance of $100,000 he received on account of the sale of the Rough Rider group does not appeal to us. The sale was made for partnership purposes, and Smith received the money on April 7, 1917, five years after dissolution. The fact that Smith brought the action soon after he paid out certain sums in settlement of partnership debts, and that he expressed a willingness to account, ought not to relieve him of the duty to pay interest for moneys retained by him, which money belonged to the partnership. His testimony that he applied the money to debts due to him personally from the partnership, though true, does not put the case outside of the rule that where a partner after dissolution has retained the proceeds of a sale of firm property for more than a reasonable time he may be equitably charged with interest in an account between himself and his copartner. Rowley on Partnership, § 601.

[5] The last of the important items pertains to the Live Oak or Inspiration stock, which was partnership property, but which was sold by Hovland's creditor-pledgee to pay his personal debts—all as referred to in the statement of the findings of the master. We agree with the view expressed in the clear and comprehensive memorandum opinion filed by Judge Dooling, that upon dissolution either partner had the right to sell any of the partnership assets either to pay partnership debts or for closing the partnership, but that if either retained the proceeds of sale he should be charged interest thereon. Therefore Hovland, having a right to sell the Inspiration stock at the time he did sell it, should have used the proceeds to pay firm debts. The fact that he did not do so did not injure the partnership or his copartner, provided the sale was for the fair and reasonable value. The test is: Was the liability that he incurred greater than that fixed by the law of partnership? Upon this point Judge Dooling well said: "If, therefore, defendant, upon the sale of the Live Oak stock, or its later equivalent the Inspiration stock, had applied the proceeds to the payment of the partnership debts, plaintiff would not now be in a position to complain of such sale. The legal injury to the partnership does not lie in the sale of the stock, which as a partner defendant had the right to make, but in the withholding of the proceeds for which he was bound to account. The rule is stated in a line by Rowley (section 601) as follows: 'If a partner after dissolution retains the proceeds from the sale of firm property for more than a reasonable time he may be chargeable with interest.' "

It is argued by Smith that the value of the Inspiration stock as found by the court was too little, but there is ample evidence that the sum realized was the fair market value at the time of the sale, March, 1914.

We are of the opinion that an accounting, made in accordance with the decree of the lower court when modified in respect to the credit for Smith's interest in the Arizona King group, will equitably adjust the accounts between the parties.

The decree will therefore be modified to conform to this opinion, and as so modified will stand affirmed without costs to either party.

Modified and affirmed.