## PETER BARCELOUX CO. v. BUFFUM.

### No. 6400.

Circuit Court of Appeals, Ninth Circuit.
Sept. 8, 1932.

Rehearing Denied Nov. 21, 1932.

146

.SAWTELLE, Circuit Judge, dissenting.

See, also, 51 F.(2d) 82.

Huston, Huston & Huston, of Woodland, Cal., W. T. Belieu, of Willows, Cal., and Percy Napton, of Woodland, Cal., for appellant.

Devlin & Devlin & Diepenbrock, Robt. T. Devlin, Wm. H. Devlin, Arthur C. Devlin, A. I. Diepenbrock, and Horace B. Wulff, all of Sacramento, Cal., and George R. Freeman, of Willows, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

This action was brought by the trustee in bankruptcy to recover property alleged to have been fraudulently transferred by the bankrupt while insolvent, and is predicated upon section 70e of the Bankruptcy Act, 11 USCA § 110(e), and section 3439 of the California Civil Code, which is as follows: "§ 3439. *Transfers, etc., with Intent to Defraud Creditors.* Every transfer of property or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor, and their successors in interest, and against any person upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor."

The plaintiff alleges that on February 25, 1927, a voluntary petition in bankruptcy was filed by Henry Joseph Barceloux, who will hereinafter be referred to as "the bankrupt," or as "Henry"; that on February 25, 1928 [sic] he was adjudicated a bankrupt; that on April 27, 1926, while the bankrupt was president and managing director of the Peter Barceloux Company, which will hereinafter be referred to as "the company," he executed and delivered to the company an agreement pledging 2,499 shares of the capital stock of the company to the company to secure certain pre-existing indebtedness evidenced by three promissory notes, one for $24,064.48, one for $2,000, and the other for $3,500; that this pledge was made with intent to hinder, delay, and defraud the creditors of the bankrupt; that the company knew of the fraudulent intent of the bankrupt, and that said shares of stock were reasonably worth the sum of $80,000; that on June 29, 1926, the bankrupt deposited with the company other property as additional security for the indebtedness specified in the original pledge agreement. This property consisted of 75 shares of Pacific National Fire Insurance Company, evidenced by certificate No. 126; 5 shares of capital stock of the Bank of Orland, evidenced by certificate No. 25; 4 shares of capital stock of the Bank of Orland, evidenced by certificate No. 26; 50 shares of Glenn County Garage Company, evidenced by certificate No. 53; and 50 shares of Glenn County Garage Company,

evidenced by certificate No. 10; that the reasonable value of all such shares was $2,100. It is alleged that this transaction was also had with intent to defraud the bankrupt's creditors, and was made when the security already held by the company was of a value of over twice the total amount of said indebtedness; it is also alleged that on August 16, 1926, the company purported to hold a sale of all the securities pledged as aforesaid for the indebtedness stated in the pledge which aggregated $29,564.48, with interest, and also for certain additional indebtedness, as follows:

$1,000 claimed to have been due from the bankrupt to the company from and after January 3, 1923, with interest in the sum of $276.69; $1,717.62 claimed to be due from the bankrupt to the company within two years prior to August 4, 1926, with interest thereon amounting to $304.18; the sum of $1,800 claimed to be due the defendant within two years prior to August 4, 1926, with interest in the sum of $830—a total of $5,928.49; that of this amount the sum of $1,800, with interest of $830, was not an obligation accruing to the company nor owing to it nor secured by said pledges; that the stock was sold upon the pledgee's sale for $36,314.41, of which $35,814.41 was principal and interest, and $500 attorney's fees; that the sale was made at a pretended public sale without the demand for the payment of said indebtedness, without any notice thereof, without bidders being present at the sale, and the price realized was grossly inadequate and the sale was improvident; that the company failed and refused to adjourn the sale, "all of which was done with intent to delay and defraud the nonkindred creditors of Henry Joseph Barceloux." It is alleged that all the transactions were done and had with the intention of defrauding the nonkindred creditors of the bankrupt, and that at the time the bankrupt was in failing financial circumstances contemplating filing a voluntary petition in bankruptcy; that the value of the bankrupt's property in his hands at the time of the bankruptcy was only $300, and the liabilities, exclusive of the cost of administration, are in excess of $100,000. It is alleged that, after the pledgee's sale, the company purported to sell to George A. Barceloux, a brother of the bankrupt, all the securities purchased by it at the pledgee's sale, "and that said George A. Barceloux has at all times thereafter, and still does, purport to hold and possess said securities as owners thereof." It is alleged that the administrator, George R. Freeman, who was afterwards dismissed from the case, claimed that 2,499 shares of the capital stock of the Peter Barceloux Company were transferred to him as administrator "by way of security for the payment of a considerable sum of money, then and now due to him as such administrator by said Henry Joseph Barceloux; that an accounting is necessary to ascertain what, if any, moneys were at the time of said sale due to defendant Peter Barceloux Company by said Henry Joseph Barceloux and secured by said pledges, or either of them; that an accounting is necessary to ascertain what moneys, if any, were, at the time of said sale, and now are due or owing to said George R. Freeman upon the security of said transfer and assignment; * * * that an inquiry is necessary to ascertain the respective rights of all parties thereto; that it is necessary that the equities of all parties hereto be adjusted in one action; and that complainant is entitled to recover from defendant Peter Barceloux Company, the excess, if any, over and above the amount, if any, found to be due and owing to said George R. Freeman upon the security of said transfer and assignment at the time of said sale and still remaining due and owing, and the value of all of said shares of stock at the time of said sale."

Plaintiff also alleged: "* * * That none of said shares of stock are quoted on any stock exchange and that plaintiff has no means of ascertaining the actual value of such shares other than by an inquiry as to the valuation of the assets and liabilities of the respective corporation issuing the same, and that without the aid of this court * * * [said corporations] will refuse to allow any such inquiry and valuation."

The plaintiff prayed that an accounting be had as to the moneys due from the bankrupt to defendant George R. Freeman secured by said 2,499 shares of stock; that an inquiry and decree be had as to the valuations of all of said stocks on August 16, 1926; that the pledges of April 27, 1926, and June 29, 1926, and the sale thereunder, be decreed fraudulent and void, and that the plaintiff have judgment against the company for the value of all of said shares of stock at the time of sale, "less such sum, if any, as may be found to be due or owing to George R. Freeman, upon the security of said transfer and assignment and still remaining due and owing; * * * that an inquiry and decree be had and made as to respective rights and equities of the parties hereto * * * and for general relief."

The company answered the complaint, and, among other things, denied "that all the stock of the said Henry Joseph Barceloux is now claimed by this defendant to be owned by George A. Barceloux." It alleged that the company had held the 2,499 shares of its stock as security for the payment of obligations due it and to be due to it from the bankrupt for several years prior to April 27, 1926, and that the pledge agreement executed April 27, 1926, was not executed to it willingly or voluntarily by the bankrupt, but upon the insistent demand of the company, and without any intent on the part of the bankrupt to defraud his creditors; that at the time of the transfer he was not insolvent, and denied that at the time of the transfer the stock was of the value of more than $36,314.41, the amount for which it was sold at the pledgee's sale. The company admits that the additional property pledged to it on June 29, 1926, was so pledged, but that said shares were pledged, not only for the indebtedness covered by the pledge of the 2,499 shares of stock, but also for other indebtedness due from the bankrupt to the company, and denies that this agreement was made with the intention of defrauding creditors, and denies that the additional property pledged was worth $2,100; defendant alleges that the pledgee's sale was conducted in accordance with law, and admits that defendant George R. Freeman, as administrator, claims that the stock in the Peter Barceloux Company was assigned to him as security for a considerable sum of money alleged to be due him as administrator by the bankrupt, but alleges that this transfer to defendant Freeman by way of pledge "was long after the execution and delivery of the pledge agreement of such securities to the company" and denies that an accounting is necessary, and denies that there is no means of ascertaining the value of the shares of the corporate stock involved in the controversy. It denies that defendant Freeman has any interest in the stock, and prays that the title of the company to securities held by it be declared to be good and valid. This answer was filed April 30, 1928. March 11, 1929, the plaintiff dismissed the action as to George R. Freeman, administrator.

The case was tried as an equity case without the intervention of a jury, and the trial court found as a fact that the transactions complained of were fraudulent as to creditors, having been made with the intent to hinder, delay, and defraud creditors, as alleged in the complaint. By an interlocutory decree, a master was appointed and directed to ascertain the value of the stock, such valuation to be fixed at its highest value between the date of the pledgee's sale and the date of the commencement of the action. In pursuance of this order, the master took evidence and reported that the value of the stock ascertained in accordance with the interlocutory decree was $106,409.44. Exceptions to this report were overruled, the report was confirmed, and the court entered a decree adjudging the trustee in bankruptcy entitled to recover the full amount of $106,409.44 from the company. The decree also provided that the indebtedness due from the bankrupt to the company purporting to be secured by the pledge of the shares of stock, as aforesaid, be subordinated to the claims of all other creditors. It may be noted in passing that it was stipulated on appeal that this portion of the order subordinating the claims of the company to those of other creditors is erroneous, and the appellee consents that the decree be modified to this extent. The fraud alleged was that the actual indebtedness owed to the company was less than the amount for which the stock was pledged and sold; that the sale was made without notice, and with intent to defraud creditors; that additional stock in other corporations valued at $2,100 was pledged to secure the indebtedness due to the company, although the stock in the company already pledged to it was over twice the value of the indebtedness due to it. It appears from the evidence that the bankrupt was a man of large affairs. One of his most valuable assets was his interest in the Peter Barceloux Company, which was a family corporation organized in 1912 by Peter Barceloux, the father of the bankrupt, for the purpose of owning and operating all of his property which he transferred to it for all its corporate stock, which he immediately distributed to his children and descendants of a deceased child. The instrument conveying his properties to the company provided that during his lifetime and the lifetime of his wife, in case she should survive him, all the income derived from such property should be paid to him or his surviving wife. During his lifetime the father managed the property of the company, and after his death in December, 1918, the bankrupt, Henry J. Barceloux, became the president and manager of the company. The widow of Peter Barceloux is still living and entitled, during her life, under the terms of the deed to the entire net income derived from the property belonging to the company. While the complaint counts generally on a transfer to defraud "secured" and "unsecured" "nonkindred" creditors, the only creditor whose claim is specifically alleged in the

complaint is that of the defendant George R. Freeman, administrator of the estate of his father, Frank Freeman, upon the balance due upon a judgment in favor of Frank Freeman, amounting to $47,260.31, with interest at 7 per cent., rendered July 25, 1921, by the superior court of Glenn county, which was affirmed December 26, 1923, and became final February 24, 1924 (see Freeman v. Donohoe, 65 Cal. App. 65, 223 P. 431). This obligation to Frank Freeman arose out of the business of a copartnership composed of Freeman, Henry Barceloux, the bankrupt, and one Donohoe. Freeman sued his copartners for an accounting and settlement of the partnership affairs, and was awarded a joint judgment against his partners for $47,260.31, with interest at 7 per cent. Both Henry Barceloux and Freeman were desirous that Donohoe pay his portion of the judgment, and with that end in view co-operated to collect as much of the judgment as possible from Donohoe. Freeman insisted upon payments on the judgment by Henry Barceloux as a condition of delaying execution on the judgment, and about $6,000 was paid thereon by Henry. This effort, although continued for some time, was rather unfruitful; Donohoe having been declared a bankrupt in 1924. Freeman, in accordance with his agreement with Henry Barceloux to co-operate with him, did not issue an execution on the judgment. Frank Freeman died, and thereafter the administrator of his estate demanded security from Henry Barceloux as a condition to further delaying the collection of the judgment. In pursuance of this demand, Henry executed an assignment pledging his stock (2,494 shares) in the Peter Barceloux Company to Freeman as security for the balance due on the judgment, and in addition to that executed a deed of trust on certain real property, being an undivided one-half interest in about 5,200 acres of land in Lake county, subject to a mortgage for $30,000, and other properties as additional security therefor as shown by the schedules attached to the bankrupt's petition in bankruptcy. Henry Barceloux at that time informed Freeman that he owed the Peter Barceloux Company some $24,000 for advances made to him, and that this claim was a prior obligation against his stock. Freeman also knew that there was other indebtedness due to the company and secured by the assignments. The pledge agreement to Freeman recited that it was subject to a prior pledge to the company. As was said by the Supreme Court of Oklahoma (Smith-McCord Dry Goods Co. v. John B. Farwell Co., 6 Okl. 318, 50 P. 149, 151),

in dealing with the similar rights of chattel mortgagees of a stock of goods: "A creditor who accepts a second mortgage, which expressly recites that it is subject to a prior mortgage, is estopped from attacking its validity, or from asserting that it was made to defraud creditors"—citing Muncie Nat. Bank v. Brown, 112 Ind. 174, 14 N. E. 358; Rennick v. Bank, 8 Ohio, 535; Irwin v. Longworth, 20 Ohio, 581.

It appears without conflict in the evidence that there was in fact an indebtedness due from Henry Barceloux to the company of at least $24,064.48 at that time. The books of the company show that balance to be due to the company and checks for large amounts were issued by Henry Barceloux as president of the company to himself as payee, and were marked "advances," and paid to his order by the drawee bank long before the pledge of the stock to the company. At the time of the pledge of the stock of the company (2,499 shares) to Freeman, the latter was furnished a complete written statement of all the assets of Henry Barceloux. It is not disputed that this statement was correct as to the nature and amount of the assets, although the value of some of these assets was overrated. The administrator examined the question as to the assets of the bankrupt available for the payment of his debts, and, after such examination, accepted the pledge and trust deed as stated. A part of the amount owed by the bankrupt to the company was for money advanced to Henry to be paid to Freeman on account of his judgment, and thus about $6,000 was paid thereon. It can hardly be said that the pledge of the company's stock to the company to secure advances due to it, a part of which was used to pay Freeman, was intended to defraud Freeman, where Freeman was given the benefit of all the equity in the stock by way of a second lien thereon, and also given a trust deed upon valuable real estate in addition thereto. The most that can be said of the transaction is that it was a preference, and a preference per se cannot be fraudulent solely because it is designed to, and does in fact, defer other creditors to the preferred creditor. This subject was discussed by the Supreme Court of California in Heath v. Wilson, 139 Cal. 366, 73 P. 182, 184, as follows:

"It is provided in the Civil Code: 'A debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another. Nor do the provisions of this title affect the power of a person, although

insolvent, and whether residing within or without this state, to transfer property in this state, in good faith, to a particular creditor, for the purpose of paying or securing the whole or a part of a debt owing to such creditor, whether in his own right or otherwise.' §§ 3432, 3451.

"The above provisions expressly authorize a conveyance for the purpose of paying or securing certain creditors. The sections are but a declaration of the rule of the common law. It is founded upon the principle that a man may do as he pleases with his own. It is the well-established rule, settled by all the authorities, that the owner of property, even though insolvent, when there is no bankrupt or insolvent law making a different disposition of it, may lawfully transfer it to the payment of any creditor or creditors, to the exclusion of others. It was said by Justice Field in the early case of Dana v. Stanfords, 10 Cal. 278: 'From the very power which a man possesses over his own property, it follows that he can dispose of it in any manner he may see fit, which does not contravene the general policy of the law. That policy restricts the power of disposition, so as to prevent the withdrawal of the property from the claims of his creditors. It is no part of such policy to inhibit its application to the payment of one debt rather than another. It would, indeed, be unreasonable to deny, on the one hand, the right to give a preference by voluntary payment or security, and to allow, on the other hand, such preference to be acquired by compulsory process of attachment or execution. A conveyance giving such preference is not fraudulent, though the debtor be insolvent, and the creditor be aware, at the time, that it will have the effect of defeating the collection of other debts. To avoid the conveyance, there must be a real design on the part of the debtor to prevent the application of his property, in whole or in part, to the satisfaction of his debts. A creditor violates no rule of law when he takes payment or security for his demand, though others are thereby deprived of all means of obtaining satisfaction of their own equally meritorious claims.' And this is the doctrine of all the cases. Handley v. Pfister, 39 Cal. 283, 2 Am. Rep. 449; Lawrence v. Neff, 41 Cal. 569; Priest v. Brown, 100 Cal. 631, 35 P. 323; Low v. Wortman, 44 N. J. Eq. 202, 7 A. 654, 14 A. 586."

See, also, to the same effect, Van Iderstine v. National Discount Co. (C. C. A.) 174 F. 518; and Richardson v. Germania Bank of N. Y. (C. C. A.) 263 F. 320.

Whether a lawful preference or a lien given with fraudulent intent, clearly Freeman consented thereto, and waived any right to complain thereof when he accepted a second lien on the stock. It should also be stated that Henry Barceloux testified that there was a long prior agreement between himself and his father representing the company that his stock in the company was pledged or to be pledged to the company to secure all advances then or subsequently made to him by it, and that as early as 1923 the stock certificate for the 2,499 shares was indorsed in blank and left with or delivered to the officers of the company as such security. The opinion of the trial judge indicates that he was of opinion that this antecedent pledge was void for lack of delivery by the bankrupt to the company because after the delivery of the certificate the latter remained in his custody as president and manager of the company, and there was consequently no change of possession. However, the delivery of the certificate indorsed in blank to the company or its officer as a pledge was ipso facto such a change of possession as the law contemplates. Sections 219, 220, 221, 6 Cal. Jur. pp. 816, 817. The fact as to this original pledge, made in 1918 or 1923, depends upon the weight to be given to the testimony of Henry. That question might affect other creditors, but as to Freeman was immaterial because he accepted and ratified the later transaction (1926), pledging the stock to the company, believing, as he says, that there was ample equity to secure his claim.

What we have said so far applies to the pledge to the extent of $24,064.48 and other existing indebtedness. The real complaint of Freeman, as shown by his testimony, is that the pledge to the company was for the additional amount specified, $5,500, i. e., for a note of $3,500 dated February 6, 1923, and a note for $2,000 dated April 27, 1926, and of the pledge of additional stock in other corporations valued at $2,100, and for the inclusion in the sale of other indebtedness which he claims was not bona fide. An examination of the record satisfies us that the claim that such amounts were due the company was made in good faith by the company. The only item seriously challenged by the appellee's evidence is the item of $1,800, plus $830 interest. This amount was money received by the bankrupt as the purchase price of a one-third interest in an estate held by the bankrupt as trustee for Peter Barceloux. The $1,800 was received for the third interest of the father sold in 1917. The amount was acknowledged by Henry as due the company,

and the sole point advanced in support of the alleged invalidity of the claim is that the father neglected to make a formal and legally sufficient transfer thereof to the company. The pledge agreement, in so far as the indebtedness due the company other than that specifically named in the pledge agreement is concerned, merely permitted the application of the surplus derived from the sale to such indebtedness. This debt of $1,800 and interest was not due to the company, and should not have been charged against the proceeds of the sale, for it was an indebtedness due to the father, Peter Barceloux, and was not transferred to the company. Nevertheless the claim therefor was made in good faith.

So far as the right of the trustee in bankruptcy is predicated upon the right of Freeman to question the pledge to the company, it cannot be sustained, for he cannot complain of the prior pledge to which he assented.

It remains to consider the rights of the trustee as a representative of other creditors existing at the time of the pledge to the company and sale thereunder. The complaint does not allege the existence of a single creditor other than Freeman at the times involved, nor does the evidence clearly show that any creditors, other than the company and Freeman, were affected by the pledge and sale thereunder. The complaint does allege in general terms that the bankrupt was in "failing financial circumstances and/or insolvent and contemplating the filing of a voluntary petition in bankruptcy"; that at the date of bankruptcy the total assets were $300 and the liabilities in excess of $100,000. Whether any of these creditors were such at the date of the pledge in June or the sale in August does not affirmatively appear either from the allegations of the complaint or from the proof. It is a fair inference that there were such creditors, but fraud should be distinctly alleged and clearly proved. Freeman testified that he was the only active creditor, and the case was tried with his rights particularly in view. The evidence does not justify a decision in favor of the trustee on appeal based upon the rights of other creditors, nor is the case briefed or argued upon that theory. Concluding then that the pledge of stock to the Peter Barceloux Company was valid, it remains to consider whether the sale thereunder was also valid.

It appears that Freeman desired to avail himself of his lien on the equity in the stock in the company thus pledged to the company for the indebtedness due to it from Henry Barceloux. To that end he asked the company to notify him of any pledgor's sale, and requested that he be given at least ninety days' notice thereof. This request was completely ignored, and the sale was made at a time and place not likely to be known by Freeman and without any actual notice to him and with the evident design of cutting off his equity. Such conduct does not appeal to the conscience of the chancellor, and, if consistent with the applicable principles of law, the trustee should be relieved from the forfeiture of the equity in the stock so sold. There is a divergence of views among the members of the court as to the consequences which should flow from the manner and method of the sale. In view of the fact that the company has tendered the stock to the clerk of the court for such disposition as may be made thereof in equity and good conscience, it will be unnecessary to pass upon the question of the validity of the sale, for in any view the decree of the trial court awarding judgment for the value of the stock cannot be sustained, for reasons that will be presently stated, and a sale of the stock under the decree of the court in accordance with the rights of the parties will be just under the circumstances.

The decree appealed from awarded judgment for the value of the stock instead of directing the delivery of the stock to the trustee or its sale and the disposition of the proceeds, in accordance with the rights of the parties. At the time the action was begun, the title to all of the stock was in George Barceloux. However, after the complaint had been filed in the case, but before the trial, George Barceloux retransferred to the corporation the stock in the Peter Barceloux Company which he had purchased from the corporation after the pledge sale. That stock was accepted by the corporation, and the note given as the purchase price thereof was canceled. The stock certificate was offered in evidence and deposited with the court. The testimony showed that it had been transferred to the corporation, and all the other stock sold at the pledgor's sale was also returned to the corporation.

While this action is brought under the provisions of section 70e of the Bankruptcy Act, 11 USCA § 110(e), which provides that "such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value," it has been uniformly held that this provision of the Bankruptcy Act does not give any substantive right in cases of transfer made more than four months before the institution of the

bankruptcy proceeding, but merely authorizes the trustee to enforce the rights of creditors in accordance with the laws of the state applicable to the transaction. Davis v. Willey (D. C.) 263 F. 588; affirmed (C. C. A.) 273 F. 397; 11 USCA § 110, note 829; Scales v. Holji, 41 Cal. App. 734, 183 P. 308. The purpose of an equitable action on behalf of creditors under section 3439, Cal. Civ. Code, is to remove the obstacle to the enforcement of the rights of creditors which arises because of the transactions, which, although valid between the parties, are deemed void as to creditors because of the intent to defeat their efforts to subject such property to their claims. As stated by the Supreme Court of California in Sewell v. Price, 164 Cal. 265, 128 P. 407, 409, concerning such an action: "It is really an action for equitable relief against the obstruction caused by a transfer, which hinders him in satisfying his claim by the ordinary process of law; that is to say, by an execution."

■■■ The question for consideration is whether or not it is proper to enter a judgment for the value of the property transferred where that property is subject to the jurisdiction of the court. There is no doubt that under these circumstances the court, having determined that the transactions by which the bankrupt was divested of his title were fraudulent as to creditors, could have directed that the stock be subjected to the claims of creditors, and the question is whether it was error instead to render judgment for the value thereof under these circumstances. It was decided by the Appellate Division of the Supreme Court of New York in Wasey v. Holbrook, 141 App. Div. 336, 125 N. Y. S. 1087, 1089, that this could not be done, and this decision was affirmed by the Court of Appeals of the state of New York, 206 N. Y. 708, 99 N. E. 1119. The decision is so pertinent that we quote therefrom as follows:

"While it is true the distinction between actions at law and suits in equity, and the forms of those actions and suits, have been abolished (section 3339, Code Civ. Proc), nevertheless we still have in fact the action at law and the suit in equity, and in either case the judgment obtained must be warranted by the facts stated in the complaint and embraced within the issue. Section 1207, Code Civ. Proc.; Murtha v. Curley, 90 N. Y. 372; Harrison v. Obermeyer & Liebmann Co., 64 App. Div. 499, 72 N. Y. S. 270. If, however, the suit be in equity, the court will adapt its relief to the exigencies of the case;

but it will order a sum of money to be paid to the plaintiff, or give him a personal judgment therefor only when that species of relief is necessary to prevent a failure of justice or where for any reason it is impracticable to grant the specific relief prayed for. Hubbell v. Henrickson, 175 N. Y. 175, 67 N. E. 302; Valentine v. Richardt, 126 N. Y. 273, 27 N. E. 255.

"Here, a personal judgment was not necessary, nor were any facts proved which would justify it. Full and complete relief can be given the plaintiff by directing the appellant to return the certificates of stock in question and requiring him to account for any dividends or benefits derived from them during the time he has held the same.

"The awarding of the personal judgment is sought to be sustained upon the ground that the stock has, since it was transferred, depreciated in value. In the first place, the evidence does not clearly or satisfactorily establish such fact, and if it did not, a single fact was proved which tended to show that such depreciation was due to any act of the appellant or that he had done a single thing to impair its value. Where a suit is brought to set aside a transfer of property on the ground that it is fraudulent as to creditors, a personal judgment can only be given against the transferee when it appears that he has done some act which makes it impossible for him to return the property, or else has destroyed or impaired its value. An examination of the authorities cited by the respondent will, it is believed, show that this is the ground upon which a personal judgment in such an action is given.

"The foregoing views do not necessarily lead to a reversal of the judgment.

"Upon the findings full and complete relief can be given by modifying the judgment, so that it shall direct the appellant to return to the plaintiff certificates representing 740 shares of the stock in question and to account for all dividends received thereon while he has held the same, and as thus modified the judgment is affirmed, without costs to either party in this court. All concur."

The Supreme Court of California in Swinford v. Rogers, 23 Cal. 233, had under consideration a decree rendered in a suit in equity brought by a debtor to subject to his claim property fraudulently conveyed. A judgment had been rendered against the fraudulent vendee for the amount of the creditors' judgment. It also directed that the conveyance by the debtor of certain mining ditches be canceled, and that the same

be sold and the proceeds applied to the payment of the debt. The appellant objected to the personal judgment against the fraudulent vendees. In that regard the court said: "As a general rule, a Court of Equity declares the fraudulent conveyance void, and directs that the property be sold for the satisfaction of the creditors' debt; but where a fraudulent vendee sells the property, or converts the same to his own use, that kind of relief is rendered impracticable, and he is clearly liable to account for the value thereof, and pay the same to the creditors of the vendor. (Ludlow v. Kidd, 4 Ham. [4 Ohio] 244; Sparrow v. Chesley, 19 Me. 79; Jones v. Henry, 3 Litt. [Ky.] 428.)"

This case was followed by the California District Court of Appeal for the Third District in Henderson v. D. S. Denehy Merc. Co., 48 Cal. App. 41, 191 P. 558.

The Supreme Court of the United States had occasion to consider the nature of the remedy to be administered in the creditors' bill in Dunphy v. Kleinschmidt, 78 U. S. (11 Wall.) 610, 615, 20 L. Ed. 223. Mr. Justice Bradley, speaking for the court, commented as follows upon the remedies to be administered upon the creditors' bill: "In an equitable proceeding of this kind, a decree in the nature of a judgment for damages cannot be rendered against the defendant who is alleged to have taken a fraudulent assignment of the property. The decree against him must be a decree for an account. He must be called to account for just what property has come into his hands, and no more; and he will be entitled, under ordinary circumstances, to a rebate for the amount that was justly and honestly his due. The mode of taking such an account is well known in equity proceedings. The defendant is to exhibit an account either in his answer or in the master's office, and if it is not satisfactory to the complainant, it may be surcharged or falsified; and, as the account is finally found to stand, so will the responsibility of the defendant be. But if the complainant wishes to make him answerable in damages, either for the waste of the property or for its disposal by the original proprietor by aid of the wrongful complicity of the defendant, he must sue for damages in an action at law."

The appellee attempts to justify the decree in the case at bar upon two grounds, first, that at the time of the institution of the action the title to the stock was actually outstanding in George Barceloux, and that the case must be adjudicated with reference to the facts as they existed at the time of the institution of the action; second, upon the ground that the transfer from George back to the company was void under the California law for the alleged reason that the corporation is prohibited from buying its own stock. With reference to the first point it is sufficient to say that the purpose of the action is to secure the aid of the court to subject certain property to the claims of creditors, which in equity and good conscience belongs to the debtor so far as they are concerned. The plaintiffs, having invoked the power of the court of equity to assist them in subjecting this property to their debts, cannot complain if they are given that to which the law entitled them; namely, the right to satisfy their claims from the property fraudulently transferred. They are only entitled to judgment for the value of the property in the event and for the reason that the property itself could not be subjected to their claims. The substitution of the value of the property for the property itself is not a right of the plaintiff, unless and until it is determined that the property itself cannot be subjected to his claim, in which event a court of equity will remedy the defect so far as may be done by substituting for the property a judgment for its value.

In this regard it should be noted that the situation is entirely different from that involved in an action brought by an owner of property for its conversion. He can elect to treat the conversion as a transfer of the title and sue for its value, or to recover the property itself by an action in replevin. The party who has unlawfully converted the property cannot complain of either course. The trustee in bankruptcy, acting for the creditors, has no right of election. His right is to have the conveyance declared void as to him, and in consequence to have the property subjected to the claims of the creditors he represents.

█ As to the claim that the transfer of the stock by George to the company was void under California law "for the reason that the corporation is prohibited from buying its own stock," it is sufficient, for the purpose of this suit, to say that appellant's contention in this case is predicated upon the alleged invalidity of the pledge of the stock by Henry to the corporation, the invalidity of the pledgee's sale thereunder, and it is clear from the evidence that, when George Barceloux purchased the stock from the company, he was thoroughly advised of the whole situation and charged with notice thereof, and that the sale to him was void for the same reason that the pledge to the corporation was void, if it was void, and his act in retransferring the

stock to the Peter Barceloux Company was merely a voluntary relinquishment of the right which he could have been compelled to relinquish had he been made a party to the suit. The retransfer of the stock of the corporation to itself by George merely restored the status quo, and was in no sense a purchase by the corporation of its stock in violation of the statutory rule. See Ralston v. Bank of California, 112 Cal. 208, 44 P. 476.

Without determining whether or not the pledgor's sale was void for the alleged reason that, although the legal formalities of such a sale were complied with, there was an alleged fraudulent intent to delay and hinder creditors, we hold that the pledge was valid, and that the appellee at most is entitled to what the appellant concedes, namely, a sale of all the stock pledged under an order of court and to an application of the proceeds to the claims of the Barceloux Company aggregating $33,184.41 (being $35,814.41, less $1,800 plus $830), with interest on the several items of indebtedness above referred to at the legal rate of 7 per cent., where no rate was agreed upon, otherwise at the agreed rate. If all the stock pledged to the Peter Barceloux Company sells for more than the amount due to that company as herein determined, the surplus shall be paid to the trustee to be applied to the claim of Freeman, as alleged in the complaint or bill herein, and, if there be any surplus over and above the claims of the Peter Barceloux Company and of Freeman, the balance should be applied to the claims of the general creditors.

The decree is reversed, and the cause remanded to the trial court to fix the time, place, and terms of the sale of said stock, and to direct the application of the proceeds of the sale in accordance herewith.

Decree reversed.

SAWTELLE, Circuit Judge (dissenting).

Many of the assignments and specifications have not been prepared in accordance with the rules of this court. Repeatedly there has been failure to "quote the full substance of the evidence admitted or rejected" to enable one to make an intelligent ruling without having recourse to the transcript and even to the exhibits. While a federal court would be technically justified in disregarding such faulty assignments and specifications altogether, I have preferred to waive formal defects and considered all the specifications except one.

On the other hand, the appellee complains that the appellant's specifications 12 to 17, inclusive, point out alleged errors made by the master that were not before the trial court, on exceptions appearing in the record. Examination of the transcript, however, will disclose that the subject-matter of the six specifications complained of, especially specification 17, was, in substance at least, covered by the defendant's exceptions to the master's report. All these exceptions were overruled by the lower court.

I will therefore consider all the specifications of error except one (specification 17a).

The first two assignments deal with the power of a court of equity to render a money judgment, in view of the fact that most of the stocks held under the purported pledge were still in the defendant company's possession and could be returned in kind, if the court so ordered.

It is fundamental law that, when a court of equity once has jurisdiction, it may give legal relief. Equity Rule 23 (28 USCA § 723).

That the lower court had jurisdiction to determine this suit on the equity side is admitted by the appellant. I am not at this time passing on the question of the validity of the jurisdictional claims to equity relief, made in the bill of complaint. Sufficiency of the proof of these allegations—the necessity for the appointment of a master; for example—was not attacked by the defendant during the trial, and obviously cannot be considered on appeal, especially since such sufficiency is not the subject of an assignment of error.

The appellant urges, however, that the relief granted by the court is beyond the jurisdiction of the latter.

Considering the record, as I find it, devoid of seasonable objection as to jurisdictional facts, I cannot support this contention.

Section 70e of the National Bankruptcy Act (11 USCA § 110(e) provides: "The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless it was a bona fide holder for value prior to the date of the adjudication."

In the present suit, the trustee prayed for an accounting, for the sale to be decreed fraudulent and void, and for the value of the shares of stock on the date of the pledge sale, August 16, 1926, with interest at 7 per cent. The interlocutory decree appointed an "auditor or master to examine the parties under oath, touching all matters contained in this

reference," etc., and to ascertain "the highest aggregate value of the property and stocks" between August 16, 1926, and the date of the approval of the audit.

This was a decree within the jurisdiction of a court of equity, as was the order of confirmation made thereunder. The ascertainment of the values of various stocks on a given day, especially in a case where it is alleged that the corporations represented are hostile and where it is admitted by the defendant that "none of said shares * * * are quoted on any stock exchange," is clearly a task that a master in an equity case could perform better than could a jury in an action at law.

In Balfour et al. v. San Joaquin Valley Bank et al., 156 F. 500, 502, 503, the United States Circuit Court for the Northern District of California said: "To reach a conclusion on the merits, an account will have to be stated between the parties. It would manifestly be impossible for a jury, in the time allotted for the consideration of a case, or at all, for that matter, to arrive at an accurate statement of the debts and credits and strike a balance. Its verdict would be guesswork. The authorities sustain the jurisdiction of equity in cases similar to the one presented by the bill of complaint. The decision in Hanks Dental Association v. International Tooth Crown Co., 194 U. S. 303, 24 S. Ct. 700, 48 L. Ed. 989, makes the necessity for retaining the case in equity all the more apparent."

In Kinney-Coastal Oil Company et al. v. Kieffer et al., 277 U. S. 488, 507, 48 S. Ct. 580, 584, 72 L. Ed. 961, the Supreme Court said: "It is a general rule that a court of equity, in a suit of which it has and takes cognizance, may administer complete relief between the parties, even though this involves the determination of legal rights which otherwise would not be within the range of its authority. Camp v. Boyd, 229 U. S. 530, 552, 33 S. Ct. 785 (57 L. Ed. 1317); McGowan v. Parish, 237 U. S. 285, 296, 35 S. Ct. 543 (59 L. Ed. 955); United States v. Union Pacific Ry. Co., 160 U. S. 1, 50, et seq., 16 S. Ct. 190 (40 L. Ed. 319)."

See, also, Rice & Adams Corporation v. Lathrop, 278 U. S. 509, 515, 49 S. Ct. 220, 73 L. Ed. 480; People of Porto Rico v. Livingston (C. C. A.) 47 F.(2d) 712, 721.

This court has repeatedly recognized the power of a court of equity to render a money judgment in cases similar to the one at bar.

The language of Judge Hunt in Brainard v. Cohn (C. C. A.) 8 F.(2d) 13, 15, is applicable to the instant case: "It is true the trustee seeks a money judgment, but he also asks that certain transfers made by the bankrupt in carrying out a conspiracy to defraud creditors may be set aside, and for an accounting with respect to quantities of personal property taken by defendants, and which has been mixed and confused beyond possible identification with the property of defendants, and for an injunction pendente lite against threatened removal or disposition of certain property, part of which belongs to Cohn, but which has been confused with that taken, and for such further relief as he may be entitled to. Relief against such a situation calls for the exercise of the flexible jurisdiction of equity, to the end that the wrongdoers shall not profit by their wrongs and that innocent creditors shall not suffer by them." See, also, In re Wright Motor Co. (C. C. A.) 299 F. 106, 108, in which Judge Hunt again delivered the opinion.

In the instant case, the trustee asked for an accounting and for the appointment of a master. Though the necessity for an accounting was denied in the defendant's answer, the necessity for the appointment of a master to make an audit was at no time challenged during or after the trial, nor is it the subject of an assignment of error even at this late date.

In the Wright Case, supra, Judge Hunt affirmed a money judgment ([D. C.] 292 F. 197, 202) rendered in an equity suit.

Specification 3 deals with the asserted lack of evidence to sustain the decree of the court. In the briefs for the appellant, the lack of evidence complained of relates to the alleged fraud.

There is no need for an extended analysis of the evidence to sustain the lower court's finding of fraud. The sequence of events from June 29, 1926, the purported date of the issuance of certificate No. 12, whereby Henry's 2,499 shares were pledged to the appellant, and February 24, 1927, when Henry filed his voluntary petition, clearly discloses a plan to "freeze out" nonkindred creditors from the family corporation's stock and from other of Henry's assets.

I will advert, however, to one significant bit of testimony by George A. Barceloux, president of the company, which appellant's elaborate and ingenious briefs have failed to explain:

"Q. What happened between the 27th day of April, 1926 [the purported date of the pledge agreement], and the 29th day of June, 1926, the purported date of Certificate

No. 12 by which the Company acquired Henry's 2,499 shares as pledgee that actuated you to have it [the certificate] issued? A. Well, I had heard that you got a trust agreement for deed of trust recorded on that Lake County Ranch, and got suspicious that if you had that done you had induced Henry to break that escrow agreement I had and record that, or otherwise you could not have that deed of trust on record."

Yet Exhibit 16 shows that the deed of trust was executed on June 30, 1926, and was recorded on July 3, 1926; the latter date being four days later than that of the purported date of certificate No. 12. Hence, regardless of the date of the pledge agreement, which itself is alleged to have borne a feigned date, certificate No. 12 must have been antedated—so as to place it before June 30, 1926, the date on which Henry assigned to Freeman his 2,494 shares of the 2,499 that he had theretofore pledged to the company. This inference of antedating is inescapable if we accept George's testimony as to why the certificate was issued.

Finally, there is probably no question that this series of transfers by Henry to his kindred and to his attorney left him, as he said, with no "property * * * of any kind." There is ample justification, at any rate, for the conclusion that these transfers tended to hinder, delay, and defraud Henry's nonkindred creditors, whose claims, including Freeman's, are alleged to have aggregated more than $90,000.

But, since these transfers occurred prior to the commencement of the four-month period preceding the filing of the petition in bankruptcy, it is necessary, before they can be successfully attacked by the trustee, that they be shown to have been fraudulent under the state law. In Stellwagen v. Clum, 245 U. S. 605, 614, 38 S. Ct. 215, 218, 62 L. Ed. 507, the Supreme Court said:

"This section [70(e) of the Bankruptcy Act] as construed by this court gives the trustee in bankruptcy a right of action to recover property transferred in violation of state law. Security Warehousing Co. v. Hand, 206 U. S. 415, 425, 426, 27 S. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789; Knapp v. Milwaukee Trust Co., 216 U. S. 545, 548, 557, 30 S. Ct. 412, 54 L. Ed. 610.

"And a right of action under this subdivision is not subject to the four months' limitation of other sections (60b, 67e) of the Bankruptcy Act. Under this subdivision if a creditor could have avoided a transfer under a state law, a trustee may do the same."

See, also, Dodd v. Raines (D. C.) 1 F.(2d) 658, 659; and Gross v. Grossman (C. C. A.) 2 F.(2d) 458, 460.

The Civil Code of California provides:

"§ 3439. Every transfer of property or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor, and their successors in interest, and against any person upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor.

"§ 3440. Every transfer of personal property, other than a thing in action * * * is conclusively presumed if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent, and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of such creditors, and against any persons on whom his estate devolves in trust for the benefit of others than himself. * * *

"§ 3442. In all cases arising under * * * the provisions of this title, except as otherwise provided in section thirty-four hundred and forty, the question of fraudulent intent is one of fact and not of law; nor can any transfer or charge be adjudged fraudulent solely on the ground that it was not made for a valuable consideration; provided, however, that any transfer or encumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, shall be fraudulent, and void as to existing creditors."

In the language of the California statute, the question of fraud is one of fact and not of law. While some of the evidence was documentary, much of it consisted of testimony, such as that dealing with an old oral understanding between the bankrupt and his deceased father or with the question of whether a date was actually written in on the purported day, or similar matters.

In its opinion the lower court made it clear that it based its conclusions largely upon its estimate of such testimony: "Moreover, taking into account all the facts and circumstances in evidence, all that makes for credibility of witnesses and weight to be given to evidence, all the indefinable impressions of the trial, the conviction is compelled that

the transfers involved were made with intent by all parties to hinder, delay and defeat Henry's creditors."

Such "indefinable impressions of the trial" are indeed the persuasive imponderables of an equity suit involving fraud.

It may be well, furthermore, to point out at this juncture that, on July 3, 1926, the Barceloux Company held securities valued by the master at $94,949.66, as of August 16, 1926, to secure debts amounting to $29,564.48, or more than three times the value of the three notes secured by the pledge.

Yet on that day Henry gave the company additional security valued by the master at $2,158, as of August 16, 1926. According to Henry's testimony, this additional security was for "the debt I owed them and not having paid any interest to the corporation, but I think there was some amount paid at some time or another as interest."

Incidentally, the foregoing is a sample of the vagueness of much of the testimony given by members of the Barceloux family in connection with important matters.

This court has repeatedly held that, under such circumstances, it would not be inclined to disturb lightly the findings of the lower court. Jones v. Jones, 35 F.(2d) 943, 945; John T. Porter Co. et al. v. Java Cocoanut Oil Co., Ltd., 4 F.(2d) 476, 478, certiorari denied, 268 U. S. 697-698, 45 S. Ct. 515, 69 L. Ed. 1163; Ostbern v. Dean, 18 F.(2d) 1019, 1020; Monson v. Hibler, 24 F.(2d) 909, 910.

The case of Porter v. Java Company, supra, presented facts in many respects similar to those at bar. There, too, the date of the execution of a pledge was in controversy, and interested parties testified as to that fact. In discussing this phase of the case, Judge Rudkin said: " * * * Without going into further detail, we think it is apparent, from what we said, that the question involved was purely one of fact for the consideration of the trial court, and that the findings of that court, based on conflicting testimony taken in open court, will not be disturbed on appeal. Boss v. United States (C. C. A.) 290 F. 167; Taylor v. Nevada Humboldt Tungsten Mines Co. (C. C. A.) 295 F. 112."

In Monson v. Hibler, supra, Judge Gilbert thus stated the rule: "The judgment of a District Court on the facts will not be disturbed on appeal unless it is clearly against the weight of the evidence, or unless plain and manifest error exists; and this is especially true where both the referee and the District Judge have coincided in their conclusions. [Cases cited.]"

Without further reviewing the evidence as to fraud, therefore, I can say that I see no reason for disturbing the findings of the lower court in the case at bar. I believe that there was ample evidence of fraud, both within the meaning of the California law and within the spirit of the National Bankruptcy Act.

Specifications 4 and 5 allege that the lower court had no jurisdiction to render a decree fixing the value of the stocks in excess of that set forth in the bill.

Examination of the bill does not bear out this objection. Paragraph IV alleges that the complainant "is informed and believes, and upon such information and belief alleges," that the 2,499 shares of Barceloux Company stock were "reasonably worth" $80,000. Paragraph V uses similar language with reference to the shares comprising the second pledge. But paragraph X specifically avers that "plaintiff has no means of ascertaining the actual value of such shares other than by an inquiry as to the valuation of the assets and liabilities of the respective corporation[s] issuing the same, and without the aid of this Court, defendant Peter Barceloux Company, and the others of said corporations, will refuse to allow any such inquiry and valuation."

Surely under such pleadings a court of equity will not hold the complainant to an estimate, avowedly a mere approximation, of its adversary's own holdings—the very accuracy of which estimate, indeed, is sought to be tested, both in the allegations and in the prayer of the bill.

Furthermore, general relief is prayed for. The lower court, having jurisdiction, might grant any relief consistent with the pleadings and the evidence. Lockhart v. Leeds, 195 U. S. 427, 436-437, 25 S. Ct. 76, 49 L. Ed. 263.

Specification 6 adverts to the fact that the court awarded the complainant the highest value of the property or stocks involved, between the date of their transfer and the date of the decree. The prayer in the bill was "for the value of all said shares of stock at the time of said sale, to-wit, August 16, 1926, less such sum, if any, as may be found to be due or owing to George R. Freeman, as administrator of the Estate of Frank Freeman, deceased, upon the security of said transfer and assignment at the time of said sale and still remaining due or owing, together with interest thereon at the rate of 7 per cent from said 16th day of August,

1926." As the appellee has pointed out, however, the total of the sum prayed for, with interest, would exceed the stock's highest aggregate value as found by the master. Therefore, as between these two methods of fixing the amount due by the defendant, the appellant would not be injured if the latter valuation were to be allowed to stand.

The item of interest is asked for under the authority of section 3336 of the Civil Code of California:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"First. The value of the property at the time of the conversion, with the interest from that time, or, where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"Second. A fair compensation for the time and money properly expended in pursuit of the property."

This court has decided that an appeal from a decree brings up for review only what was decided adversely to the appellant, and not whether the decree, so far as favorable to him, was erroneous.

In the case of Santa Marina Co. v. Canadian Bank of Commerce (C. C. A.) 254 F. 391, 397, Judge Morrow cited numerous cases in support of the proposition that "an appeal brings up for review only that which was decided adversely to the appellant." Certiorari in this case was denied by the Supreme Court, 250 U. S. 643, 39 S. Ct. 493, 63 L. Ed. 1186.

Specification 7 deals with the court's power to render a decree for any value of the stock, in view of the fact that the latter remained in the possession of the defendant, and, inferentially, could be returned in kind. I have already disposed of this objection, by citing section 70e of the Bankruptcy Act, which gives the trustee the unrestricted election of whether he shall sue for the property or its value.

Specifications 8, 9, 11, 12, 13, 14, 15, 16, and 18 deal chiefly with the methods and the accuracy of the master's valuation of the property. In so far as these objections have not been disposed of in my foregoing holdings, they may be considered in a group.

It is conceded that the Barceloux Company is a family corporation, and that there is reserved to Lumina Barceloux, the aged mother of the bankrupt, "all of the rents, issues and profits and the income from the said real and personal property." This right belongs to Mrs. Barceloux for the remainder of her life. In its opinion, the trial court stated that Mrs. Barceloux's age was "undisclosed." This is an error. The record clearly shows that she was 87 years old on March 7, 1931..

The master valued this right of Mrs. Barceloux's as representing a liability of the corporation amounting to $7,828.77 on August 16, 1926, and $3,186.77 on September 26, 1929. The master did not disclose how he arrived at this valuation, but his accuracy is only argumentatively questioned by the appellant, in its attack upon the accuracy of the valuation of the capital stock itself.

The appellant does, however, question the master's authority to make "any such estimate" of Mrs. Barceloux's right at all. Nevertheless, it cannot be gainsaid that the duty to pay her any profits that might be made by the corporation was unquestionably a charge upon the estate of the corporation. Accordingly, in the absence of any affirmative evidence of error, I see no reason for disturbing the master's valuation. See Lumina Barceloux v. Buffum (C. C. A.) 51 F.(2d) 82.

The appellant contends that the family corporation has operated at a loss for three years, that lands are the principal assets of the company, and that the lands are producing no revenue. The appellee asserts that the company has no business, no good will, or none of the other factors that go to make up the value of the stocks of a corporation engaged in a business.

For practical purposes, these views are not very far apart, so far as they lead to the determination of the proper method of valuing the stock. As the appellee points out, the elements that the appellant contends should have been considered in fixing the value of the stock would not have decreased it, and therefore again the appellant is not harmed. The authorities cited in the appellant's opening brief are not in point.

The value of the land was not lessened merely because it was owned by a company instead of by an individual. Even if we accept the appellant's own gloomy view of the corporation's condition, the minimum of the corporate worth is still the difference between its resources and its debts.

As was said by Mr. Justice Field in the case of the Bank of Commerce v. Tennessee, 104 U. S. 493, 495, 26 L. Ed. 810, "The capital stock of a corporation may in a general

sense be said to be all the property [of the corporation] in which the capital is invested."

Unless otherwise provided by the charter or by-laws, the profits and surplus funds of a corporation, whenever they have accrued, are, until separated from the capital by the declaring of a dividend, a part of the stock itself. Bailey v. New York Central & Hudson River Railroad Co., 89 U. S. (22 Wall.) 604, 637, 22 L. Ed. 840.

As we have seen, the defendant company, in its answer, admitted that none of the stock alleged to have been pledged was quoted on any stock exchange. This is tantamount to admitting that they had no known market value. When the evidence discloses no market value for stock, it is proper to establish its actual value by proof of the assets and liabilities of the company. American Surety Company of New York v. Duvall, 22 Ariz. 261, 196 P. 457, 460, and cases there cited.

The master's valuation of the assets of the corporation was based largely upon conflicting testimony, and, especially since they were accepted by the District Judge, should not be lightly set aside by this court. In re Sternberg (D. C.) 300 F. 881, 885; In re Utica Pipe Foundry Co. (D. C.) 221 F. 787, 788, 790; Smith et al. v. Carlisle (C. C. A. 5) 228 F. 666, 668; Medsker and Wife v. Bonebrake, Assignee, 108 U. S. 66, 72–73, 2 S. Ct. 351, 27 L. Ed. 654; Tilghman v. Proctor, 125 U. S. 136, 149–150, 8 S. Ct. 894, 31 L. Ed. 664; Roberts v. Southern Surety Co. (C. C. A. 4) 33 F.(2d) 501, 502, 503; Coats v. Barton (C. C. A. 8) 25 F.(2d) 813, 815; Munn v. Des Moines National Bank (C. C. A. 8) 18 F.(2d) 269, 271; Smith v. Hovland (C. C. A. 9) 11 F.(2d) 9, 13, certiorari denied, 271 U. S. 686, 46 S. Ct. 638, 70 L. Ed. 1151; Commercial National Bank v. Stockyards Loan Company (C. C. A. 8) 16 F.(2d) 911, 913, and numerous cases there cited, certiorari denied, 275 U. S. 547, 48 S. Ct. 84, 72 L. Ed. 418; In re Foley (C. C. A. 9) 6 F.(2d) 126, 127; Carstens v. McLean (C. C. A. 9) 7 F.(2d) 322, 323; Wingert v. President, etc., of Hagerstown Bank et al. (C. C. A. 4) 41 F.(2d) 660, 661, 663.

Accordingly, I find no reversible error in the master's valuation of the assets and the liabilities of the Barceloux Company, from which valuation the master arrived at his figures for the shares of stock in controversy herein.

Specification 10 relates to the relegation of the defendant company's claims to those of all other creditors. This part of the decree cannot be sustained, however, for such postponement has been, as we have seen, specifically waived by the appellee.

Specification 17 attacks the admissibility of several pieces of testimony offered before the master by the complainant-appellee and ruled upon by the court:

(a) The opinion of the witness Graves as to the market value of property. Here we have a flagrant instance of the insufficiency of some of the appellant's assignments and specifications of error. This one sets forth neither the property referred to nor the witness' answer. Reference to the transcript does not enable me to supply this deficiency, and accordingly we cannot consider this subdivision of specification 17.

(b) This relates to a change in "market value." Here, again, the specification fails to designate what property is referred to, but an examination of the testimony of Graves leads us to believe that the "home ranch" is probably meant. As we have seen, admission of such testimony would not be prejudicial, in view of the fact that the value of the stocks on August 16, 1926, with interest at 7 per cent., would exceed the highest aggregate value.

(c) This objection deals with the qualifications of the witness Eibe and the manner of framing the questions to him. In view of the facts that the witness, as county assessor, seemed well qualified to testify as to land values, and that the master is allowed considerable latitude in taking evidence, I find no reversible error in the admission of this testimony. Blease v. Garlington, 92 U. S. 1, 7–8, 23 L. Ed. 521; Kansas Loan & Trust Co. v. Electric Ry., etc., Co. (C. C.) 108 F. 702, 704; In re Automatic Musical Co. (D. C.) 204 F. 334, 335–336, and cases there cited; Chadeloid Chemical Company v. Chicago Wood Finishing Co. (C. C.) 173 F. 797; Tucker v. Peiler (C. C. A.) 297 F. 570, 574.

(d) This objection relates to the master's admission of testimony as to a sale to prove the value of bank stock. In view of the master's latitude, and, further, because the value of this stock was relevant to the larger question of the value of Barceloux Company stock, this specification does not point out reversible error.

The remaining assignments, 19 to 24, inclusive, are directed against the admission by the lower court, over the appellant's objections, of evidence, both oral and documentary. I have considered each of these assignments and specifications, carefully and separately, and am of the opinion that whatever errors, if any, which the lower court may have made

in admitting such evidence, were not prejudicial.

It would seem to serve no useful purpose to discuss these specifications in detail, in this dissent, especially in view of the fact that it already is of undue length. Such length is justifiable, if at all, on the ground that the transactions were of so intricate and complicated a character and involved charges of fraud as well as valuations and accounting relating to property alleged to be worth more than $100,000.

The earlier retention of the pledged securities—if they were indeed pledged—on the part of Henry Barceloux, and the series of transfers to relatives, by which he methodically advanced himself nearer and nearer to the shoals of bankruptcy, are susceptible of but one interpretation: the family, including Henry himself, was carrying out an elaborate plan to hinder, delay, and defraud his non-kindred creditors.

Accordingly, I believe that we should affirm that part of the judgment of the lower court which awards the plaintiff-appellee $106,409.44, together with $173.15 in costs and master's fees. We should reverse that part of the judgment that relates to the postponement of the company's claims until all other claims have been paid, and hold that the Barceloux Company is entitled to participate in the distribution of the bankrupt's assets on a basis equal to that of other creditors of its class. We should also reverse that portion of the judgment sustaining the plaintiff-appellee's objections and exceptions to the master's audit and report, in so far as it revises the master's valuations of the stocks of the Glenn County Bank and the Bank of Orland. The master's valuations of these stocks should be sustained.

### On Petition for Rehearing.

WILBUR, Circuit Judge.

Appellee's petition for rehearing calls attention to the fact that the order of the court heretofore made ignores the situation arising from the fact that stock other than that of Peter Barceloux Company was pledged for the indebtedness due that company. This stock is alleged by the appellee in his complaint to be of the value of $2,100 at the time of the pledgee's sale, August 16, 1926. The master found the value of this stock to be $2,158. This amount ($2,158) should be credited upon the indebtedness due the Peter Barceloux Company as of the date of the sale. The order heretofore made is modified to that extent, namely, that the credit of $33,184.41 be reduced by partial payment as of the date of the sale, to wit, August 16, 1926, by $2,158.

Petition for rehearing denied.