· [Civil No. 1825.   Filed March 30, 1921.]

[196 Pac. 457.]

## AMERICAN SURETY COMPANY OF NEW YORK, a Corporation, and CERRO COBRE DEVELOPMENT COMPANY, a Corporation, Appellants, v. WILLIAM B. DUVALL, Appellee.

1. TRIAL—VERDICT NOT DIRECTED UNLESS THERE IS TOTAL LACK OF EVIDENCE, OR IT OVERWHELMINGLY PREPONDERATES ONE WAY.— As the jury is the judge of the weight of the evidence, a verdict can be directed only where there is a total lack of evidence, or where the evidence so greatly preponderates one way that there can be no question as to what the verdict should be.

2. INJUNCTION — IN ACTION ON INJUNCTION BOND, EVIDENCE OF DAMAGE HELD SUFFICIENT FOR THE JURY.—In an action on injunction and *supersedeas* bonds by means of which plaintiff was restrained from disposing of corporate stock adjudged to belong to him, evidence *held* sufficient to carry to the jury the question of damage by reason of depreciation in the value of the stock during the proceedings, etc.

3. EVIDENCE—VALUE OF CORPORATE STOCK MAY BE ESTABLISHED BY PROOF OF ASSETS AND LIABILITIES.—While, in the absence of any other evidence of value, the par value is presumed to be the value in case of corporate stock which had no market value, it was proper to establish its actual value by proof of the assets and liabilities of the corporation.

4. INJUNCTION—RECOVERY ON BOND IN SUIT TO RESTRAIN TRANSFER OF STOCK NOT DEFEATED, BECAUSE OF ATTACHMENT OF STOCK.— Where, by means of an injunction and *supersedeas* plaintiff was

restrained from disposing of corporate stock, recovery on the injunction and *supersedeas* bonds will not be defeated because during that period an attachment against the stock was in existence, for the attachment being for only a small amount, it might have been dissolved by payment, or the stock might have been sold subject thereto, or plaintiff might have filed bond and freed the stock from liability.

5. INTEREST—INTEREST CAN BE RECOVERED ON INJUNCTION BOND ONLY FROM DATE OF COMPLAINT.—Interest on an injunction bond can only be recovered from the date that the complaint therefor is filed.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. W. A. O'Connor, Judge. Judgment modified and affirmed.

Mr. F. M. Hartman and Mr. Selim M. Franklin, for Appellants.

Mr. John B. Wright and Messrs. Duffy & Purdum, for Appellee.

McALISTER, J.—William B. Duvall brought this suit in the superior court of Santa Cruz county in December, 1916, against the Cerro Cobre Development Company and the American Surety Company, corporations, alleging two causes of action. In the first, he seeks to recover five thousand dollars upon an injunction bond, and in the second, fifteen thousand dollars upon a *supersedeas* bond, both given in a case entitled "Cerro Cobre Development Company, a Corporation, and H. G. Luphold, Plaintiffs, *v.* W. B. Duvall, Charles H. Kittredge, and West Coast Copper Mines Company, a Corporation, Defendants," which was filed in the superior court of Santa Cruz county in April, 1914.

In December, 1910, W. B. Duvall had filed a complaint in the superior court (then territorial district court) of Santa Cruz county, against the Cerro Cobre Development Company, a corporation, in which he sought to have himself declared the owner of 1,000,000 shares of the capital stock of the West Coast Copper

Mines Company, the certificate for which had been issued to "W. B. Duvall, Trustee." In its answer, the Cerro Cobre Development Company denied ownership of this stock in Duvall, and asked in a cross-complaint that it be declared the owner thereof. The case was tried in April, 1914, resulting in a judgment, on May 8, 1914, in favor of Duvall. An appeal was taken to this court, which rendered its decision in March, 1915, affirming the judgment. 16 Ariz. 485, 147 Pac. 695. It was again affirmed in October, 1916, on rehearing. For convenience, it will be referred to as case No. 1, and the action in which the bonds were given as case No. 2.

The plaintiffs in case No. 2, which was filed while case No. 1 was being tried, alleged that the original capital stock of the West Coast Copper Mines Company was two million shares of the par value of one dollar each, and that the Cerro Cobre Development Company was the owner of the one million shares which had been issued to Duvall as trustee, and, among other things, prayed for the appointment of a receiver for the West Coast Copper Mines Company, pending the trial, and for a temporary injunction, restraining W. B. Duvall from selling or transferring any of the said one million shares of stock or of the remaining one million shares of treasury stock which had also been issued to him. On July 6, 1914, two months after it had been adjudged by the superior court of Santa Cruz county, in case No. 1, that Duvall was the owner of this one million shares of stock, a receiver was appointed and a writ of injunction ordered issued in case No. 2, restraining Duvall from selling or in any wise transferring any of the said one million shares of stock, upon the giving by the plaintiffs in that case of a bond in the sum of five thousand dollars, which was done August 8, 1914, with the American Surety Company as surety. On

May 22d following, this injunction was ordered dissolved by the superior court, upon motion of Duvall, his ownership of the one million shares of stock having been upheld by the Supreme Court a short time previously, in case No. 1; but the Cerro Cobre Development Company, one of the plaintiffs therein, desiring to continue the injunction in effect until a rehearing in case No. 1 could be had, or perhaps until the order itself could be reviewed in case No. 2, appealed from the order of dissolution, and on May 25, 1915, gave a bond superseding it, in the sum of fifteen thousand dollars, with the American Surety Company as surety. After the judgment in case No. 1 had been affirmed on rehearing, the Cerro Cobre Development Company dismissed, on December 13, 1916, case No. 2, and on December 21st thereafter this action was filed by Duvall to recover what he claims to have been damaged as a result of his being restrained from selling his one million shares of West Coast Copper Mines Company stock.

The case was tried before a jury, which returned a verdict for the plaintiff in both causes of action—in the first, for five thousand dollars, with interest; and in the second, for fifteen thousand dollars, with interest. Judgment was entered on the verdicts for twenty thousand dollars, with interest on five thousand dollars from August 6, 1914, and on fifteen thousand dollars from May 24, 1915, the dates of the representative bonds. From this judgment and the order denying a motion for a new trial defendants appeal.

The first error assigned is the court's refusal to give the following instructions:

"(1) You are instructed that as a matter of law plaintiff is not entitled to recover in this action, and your verdict should be in favor of the defendants.

"(2) You are instructed that as a matter of law plaintiff is not entitled to recover on his first cause of action herein, and your verdict on that cause of action should be in favor of defendants.

"(3) You are instructed that as a matter of law plaintiff is not entitled to recover on his second cause of action herein, and your verdict on that cause of action should be in favor of defendants."

Appellants contend that these instructions should have been given because there was a total lack of evidence showing, or even tending to show, that plaintiff suffered any damage, either as a result of the issuing of the injunction originally or by reason of the stay bond's continuation of it after the order of dissolution. They should have been given, if there was no evidence of damage, but if any substantial proof of this allegation was adduced it was for the jury to say whether the plaintiff had been actually damaged in the manner alleged, and, if so, to what extent. It is only where there is a total lack of evidence, or where the evidence so greatly preponderates one way that there can be no question as to what the verdict should be, that a court is justified in giving a peremptory instruction of this kind. The weight of the evidence is always for the jury. The duty of this court, under these circumstances, is expressed in *Rouillier* v. *Schuster Co.,* 18 Ariz. 175, 157 Pac. 976:

"The Supreme Court will not weigh the evidence to determine whether or not it would have reached a different conclusion from that of the trial court," but confines itself "to ascertain only whether or not the judgment is reasonably supported or justified by any substantial evidence."

The stock Duvall was restrained from selling was decreed by both the superior and supreme courts of this state to be his property. The injunction was in force from August 6, 1914, to December 13, 1916, a period

of over two years and four months. The value of
this stock at the time of the injunction and the ex-
tent of its loss in value, provided there was a loss,
during the time it remained in force, were the in-
quiries toward which the testimony was largely
directed. There was practically no evidence that the
stock had a market value at any time, but the plain-
tiff contended and elicited testimony to show that
its actual or inherent value, when the injunction
issued, was large, as appeared from the company's
assets and liabilities, but that it became worthless
during the life of the restraining order. The appel-
lants, however, claimed, and introduced evidence to
substantiate their position, that the restraining order
had no effect upon the value of the stock, because it
had neither a market nor intrinsic value when the in-
junction was issued, nor afterwards.

The West Coast Copper Mines Company was organ-
ized by Duvall, October 8, 1909, under the laws of
Arizona, and its entire assets were five hundred and
forty-eight thousand shares of the capital stock of the
West Coast Smelting & Refining Company, another
Arizona corporation with a capitalization of one mil-
lion shares of the par value of ten dollars each. The
assets of the West Coast Smelting & Refining Com-
pany were the capital stock of a Mexican corporation
known as the "Tecolote Copper Company, S. A.,"
with a capitalization of five thousand shares of the
par value of one dollar each. The assets of the
Tecolote Copper Company, S. A., were the Tecolote
mines and the Artemisa mine, together with a number
of other claims "denounced" or located by Duvall, all
in the republic of Mexico. These mines, for which
Duvall testified he paid one hundred thousand dollars
in gold, on which six hundred thousand dollars had
been spent in development, and which, in his judg-
ment, were a good investment at ten million dollars,

when he left Mexico in the fall of 1913, gave to the stock of these various corporations whatever value it had. The West Coast Smelting & Refining Company had authorized the issuance of seven hundred and fifty thousand dollars in bonds, to secure which it had pledged the entire capital stock of the Tecolote Copper Company, S. A., though only about sixty per cent of these bonds had been sold. The par value of the five hundred and forty-eight thousand shares of West Coast Smelting & Refining Company stock—a controlling interest—owned by the West Coast Copper Mines Company in 1914, when the injunction was ordered issued, was five million four hundred and eighty thousand dollars. The balance of this stock was in the treasury, but, according to Duvall's testimony, was being sold in Amsterdam, France, New York, Boston, Providence, and other points, at five dollars per share—one-half the par value. Referring to a number of sales, between May 1 and May 15, 1914, Duvall testified as follows:

"These sales were all made at the same time as the other sales I have referred to, and were made after I left here to go back there. I will explain how they were all made at practically the same time. These gentlemen were anticipating holding, or purchasing the stock, and wanted to hold off to see what was the action of this court in regard to the million shares of stock, and when the court determined that I went right back and closed up the deal. . . . These people signed subscription blanks. Some paid cash and some signed subscription blanks, and some to pay at some future date. Some were completed, but most of them were canceled. When I reported on the twenty-second day of December, 1914, that a receivership had been issued against the mines company and that I could not elect our board of directors, they all went up in the air and quit. I was dovetailing these companies in, and what affected one affected the others, and I had large negotiations on with the mines company stock, and this injunction prevented

me from delivering those securities to the parties that
I had contracted to deliver that stuff to.''

Regarding the value of the stock when the injunction was dissolved, Duvall testified as follows:

''It was worthless from my standpoint because I
could not raise any money on the stock. In the first
place these injunctions and these different lawsuits
had put me in bad with my people, and in the second
place the revolution was on in Europe, and the thing
went to the bad.''

Previous to the bringing of case No. 2 in the Arizona
courts, Charles Keller and other stockholders of the
Cerro Cobre Development Company had, in May, 1912,
filed suit in the court of common pleas of Allegheny
county, Pennsylvania, against Duvall, appellee herein,
and others, for the purpose of having the mines, constituting the assets of the Tecolote Copper Company,
S. A., decreed to be the property of a Mexican corporation known as the ''Sierra De Cobre Development
Company, S. A.'' Chas. D. Ricker, a stockholder and
the secretary of the Cerro Cobre Development Company, had also filed two actions in the same Pennsylvania court previous to that time, to wit, the first,
in July, 1912, against the West Coast Copper Mines
Company, to recover five thousand shares of its capital
stock, in which he alleged that the assets of that company were believed by persons interested, including
himself, to be of great value; and the second, in
February, 1913, against Duvall, appellee herein, for a
debt of seven thousand nine hundred dollars and
seventy-three cents, in which he attached Duvall's
million shares of West Coast Copper Mines Company
stock. No one of these three cases has been tried or
dismissed, and the attachment in the last-mentioned
case is still in force. In case No. 2, in which the injunction and *supersedeas* bonds were given, the complaint, filed in April, 1914, and sworn to by Ricker,

alleged that the assets of the West Coast Copper Mines Company were of great value.

H. G. Luphold, one-time secretary and treasurer of the West Coast Copper Mines Company and the West Coast Smelting & Refining Company, and Charles D. Ricker, plaintiff in two of the actions just mentioned, both testified that the filing of the stockholders' suit, in May, 1912, in the Pennsylvania courts, against W. B. Duvall, the West Coast Smelting & Refining Company, the West Coast Copper Mines Company, the Tecolote Copper Company, S. A., and the Sierra De Cobre Development Company, S. A., to compel a conveyance of the mining property standing in the name of the Tecolote Copper Company to the Sierra De Cobre Development Company, S. A., practically destroyed the value of, and stopped all sales of, the stocks and bonds of the West Coast Smelting & Refining Company, and consequently rendered valueless the stock of the West Coast Copper Mines Company, since whatever value the stock of either of these corporations possessed came altogether from the mines belonging to the Tecolote Copper Company, S. A., whose entire capital stock was owned by the West Coast Smelting & Refining Company. John M. Freeman, an attorney of Pittsburg, Pennsylvania, who brought the Pennsylvania suit for the plaintiffs, testified by deposition that if it were successful the West Coast Copper Mines Company would be deprived of all its mining property, and its stock rendered entirely worthless.

The appointment of a receiver for the West Coast Copper Mines Company, on July 6, 1914, the day the injunction was ordered issued, according to Duvall's testimony, prevented him from voting the five hundred and forty-eight thousand shares of West Coast Smelting & Refining Company stock, owned by the West Coast Copper Mines Company, at the annual

meeting of the stockholders in December, 1914, or afterwards. Asked if this was the cause of his troubles, he replied:

"Both together [injunction and receivership] caused it, and you prevented me electing a board of directors which would finance the company and the receivership [injunction] stopped me from delivering any of the shares which I could sell and get money on."

It was only a matter of calculation for the jury to deduce from this testimony that the par value of the five hundred and forty-eight thousand shares of West Coast Smelting & Refining Company stock, owned by the West Coast Copper Mines Company, was five million four hundred and eighty thousand dollars, and that if this stock was being sold, or negotiated for, just previous to the injunction, at five dollars per share, as testified by Duvall, the value of the five hundred and forty-eight thousand shares at that time was two million seven hundred and forty thousand dollars, and that Duvall, consequently, owned one-half of the capital stock of a corporation which owned in another corporation stock valued at two million seven hundred and forty thousand dollars, though the latter corporation had sold its bonds in the sum of four hundred and fifty thousand dollars, for which its assets had been pledged. In addition to this, the jury had the statements of Duvall as to the value of the mining property which gave the stock of these various corporations whatever value it possessed, together with Ricker's sworn statement in two separate complaints that the stock of the West Coast Copper Mines Company was of great value, as well as Luphold's and Ricker's testimony, in contradiction of the latter, that the stock of neither the West Coast Smelting & Refining Company nor of the West Coast Copper Mines Company had any value after the filing of the

Pennsylvania suit, in May, 1912, coupled with the further fact that Ricker had attached Duvall's one million shares in a suit to recover an indebtedness of seven thousand nine hundred dollars and seventy-three cents. It cannot be said under these facts that there was no evidence upon which the jury could find that Duvall's stock had great value at the time the injunction was issued. Since the evidence showed no market value for this stock, it was proper to establish its actual value by proof of the assets and liabilities of the company, as was said by this court in the case of *Tevis* v. *Ryan,* 13 Ariz. 129, 108 Pac. 465:

"There are various tests for determining the value of stock in a corporation. In the absence of any other evidence of value, the par value is presumptively the value of the stock. . . . In this case, however, evidence was introduced tending to show the insolvency of the corporation, the value of its property, and its liabilities. This evidence may be properly looked to for the purpose of determining the value of the stock of the corporation. 'There is no better or safer criterion to determine the value of stock of an insolvent corporation than a comparison of the value of its assets with the amount of its liabilities.' "

In discussing this proposition, the Supreme Court of Kentucky, in the case of *White* v. *Jouett,* 147 Ky. 197, 144 S. W. 55, used this language:

"In the absence of a known market value, it is proper to admit evidence of the value of the corporation's assets and indebtedness, for the purpose of fixing the value of the stock."

Appellants urge that there is no evidence of any depreciation in the value of Duvall's stock after the issuance of the injunction, but that, on the contrary, it clearly appears that it remained the same during the life of the restraining order because the mining property, upon which its value was based, still belonged to the Tecolote Copper Company, S. A., and

no change in its condition occurred during that time. A depreciation is admitted however but it is claimed that it occurred in May, 1912, upon the filing of the stockholders' suit in Pennsylvania, as Luphold and Ricker both testified; but Duvall's statement that there were a number of sales of the stock of the West Coast Smelting & Refining Company up to May, 1914, would justify the jury in concluding that whatever depreciation there was occurred after that time. It further appeared from Duvall's testimony that the appointment of a receiver preventing him from electing a board of directors who would finance the smelting and refining company, and the issuance of the injunction restraining him from delivering any of the one million shares of stock he could have sold, along with the general condition of the country as a result of the World War, made the stock of both the West Coast Copper Mines Company and the West Coast Smelting & Refining Company unsalable and worthless to him. The fact that the mines were still owned by the Tecolote Copper Company, S. A., and had undergone no change during the life of the injunction would not necessarily lead to the conclusion that the value of the mines and the stock of the corporations based on them as assets had not changed. Other factors enter into a consideration of this question; such, for instance, as the manner in which the business of the corporation is carried on, litigation concerning its stock or assets, the business conditions of the country, and the general situation in the country where the property is located, as to peace or war. Under these facts it was peculiarly within the province of the jury to determine whether Duvall's stock had depreciated in value, and, if so, what proportion of the loss sustained thereby occurred during the life of the respective bonds. It having been established that the restraining order produced conditions dam-

aging to him, the jury was justified, under the evidence, in finding that such conditions continued until the dissolution of the injunction, since it did not appear that these conditions ceased to exist previous to that time.

The court's refusal to give the following instruction is assigned as error:

"The court instructs the jury that if you find from the evidence that the one million shares of stock of the West Coast Copper Mines Company owned by plaintiff, W. B. Duvall, and which he was restrained from selling under the injunction, had been attached, as alleged in defendant's answer herein, prior to the issuance of said injunction, and that said attachment remained in force all the time the said injunction was in force, and that said attachment prevented said plaintiff from selling said shares of stock, then your verdict should be in favor of defendants on both causes of action."

The plaintiffs in the injunction suit did not rely on the attachment to prevent Duvall's selling his stock, for it was in effect and had been for eighteen months when they procured the restraining order. It is true that possession of the stock could not have been given while the attachment lien was in force, yet there are several methods by which this handicap could have been overcome by Duvall if he had been free to sell, namely, he could have paid Ricker's indebtedness and the costs of court, in which case the attachment would have been released; or he could, under the laws of Pennsylvania, have filed a bond in the sum of twenty thousand dollars, the amount fixed by the order directing the issuance of the writ, in which case the attachment would have been released; or he could have sold the stock subject to the attachment. In view of the last alternative, the instruction would only have been proper in case the evidence had shown that the stock could have been sold for no greater

XXII Ariz.—18

amount than would have been required to liquidate Ricker's claim and the costs of court, for the only effect of the attachment, in case of a sale, subject to the lien, would have been the payment by the purchaser to Ricker, rather than to Duvall, of his seven thousand nine hundred dollars and the costs of court. The proceeds of the sale would have netted Duvall that much less. It was clear from the evidence that the value of the stock, provided it had any value at all, and the verdict of the jury would indicate it did have, was greatly in excess of Ricker's claim.

The jury awarded five thousand dollars and interest on the first cause of action, and fifteen thousand dollars and interest on the second cause of action. The court interpreted this to mean that the plaintiff was entitled to interest from the date of the respective bonds and so entered the judgment. The authorities hold:

"That interest on an injunction bond can only be recovered from the date that the complaint therefor is filed." *City of Tacoma* v. *Sperry,* 82 Wash. 393, 144 Pac. 544.

The judgment is modified by allowing interest on the twenty thousand dollars from December 21, 1916, the date the complaint was filed, and, as modified, stands affirmed.

ROSS, C. J., and BAKER, J., concur.