## WINEINGER v. KAY.
### No. 3991.

Court of Civil Appeals of Texas. Amarillo.
March 29, 1933.

F. A. Cooper, of Amarillo, for appellant.

Morgan, Culton, Morgan & Britain, of Amarillo, for appellee.

MARTIN, Justice.

Appellee sued the Imperial Chevrolet Company, a Texas corporation, Mrs. Lottie Wineinger, its president, and Hazel Wineinger, its secretary, for the breach of a contract. He alleged that he was employed by the above-named parties at $35 per week, "with an express agreement by defendants, jointly and severally, that upon the termination of plaintiff's services with the defendant Imperial Chevrolet Company for any reason, the defendants would repurchase from plaintiff his five shares of the capital stock of the defendant Imperial Chevrolet Company and pay him therefor in cash the book value thereof, and in any event the reasonable value thereof, which plaintiff says was the book value thereof as of the date of the termination of such employment, payment to be made upon the termination of such services." During the trial he dismissed the corporation and Miss Hazel Wineinger and proceeded to trial against Mrs. Lottie Wineinger alone.

In response to special issues the jury found, in substance and effect, that Miss Hazel Wineinger did sell to the appellee the five shares of stock described by him in his pleadings; that in doing so she acted as the agent of Mrs. Lottie Wineinger; that she had the authority to sell the stock, as well as to bind Mrs. Lottie Wineinger to repurchase said stock at its book value. Special issue No. 3, with the explanatory charge accompanying same, was as follows:

"Special Issue No. 3. What was the book value of said five shares of stock at the time the employment of plaintiff terminated, in July, 1931?

"In answering Special Issue Number Three above, you should determine the value of the stock in question from the reasonable actual value of the assets of the Imperial Chevrolet Company on the date mentioned in said special issue, if such reasonable actual value has been established by the evidence, and deduct therefrom the liabilities of said company at that time; and in this connection you may consider the contingent liabilities to what-

ever amount in your opinion, according to the evidence, they might become the actual liabilities of said company."

The jury answered all issues favorable to appellee, the answer to special issue No. 3 being that the book value of said five shares was $750 at the time the employment of plaintiff terminated in July, 1931.

Questions pertaining to alleged improper argument and jury misconduct will not be discussed, in view of the fact that these will not likely again occur.

The insufficiency of the evidence to support the jury's answer to said special issue No. 3 is properly presented here, and in our opinion is the only question necessary to decide.

There is a difference of opinion between counsel for the respective parties as to the exact meaning of the term "book value" as used in the pleading and in the court's charge. Whatever may be the correct general definition of this term, the respective parties to this appeal appear to have impliedly agreed in the trial court to its meaning under the particular facts of this case. The court's interpretation thereof is quoted in the explanatory charge above. Evidence for the appellant followed this theory and no objection of any kind by appellee appears in the record. He apparently acquiesced therein.

There are authorities which sustain the trial court's view. In Steeg v. Leopold Weil Bldg. & Imp. Co., 126 La. 101, 52 So. 232, 235, it is said: "And by 'book value' we understand, not any arbitrary or fictitious value that may be entered on the books of the company, but the value as predicated upon the market value of the assets of the company, after deducting its liabilities." Such term is defined in 9 C. J. p. 138, as follows: "As applied to corporation stock, the value is predicated on the market value of the assets of the company, after deducting its liabilities." Other authorities give a somewhat different definition, but we do not pause here to discuss or attempt to distinguish these for the reason that we need look no further than the interpretation placed on this term by the parties themselves and which was embodied in the court's charge already quoted.

The only affirmative evidence of the book value of the stock in question introduced by appellee was a financial statement made by the local corporation to the General Motors Acceptance Corporation. This showed its net assets on June 30, 1931, to be $11,333.08. The corporation's bookkeeper testified, however, in detail to the value of the various items making up the total of assets and to the fact that an arbitrary value was placed on many of such items without regard to their actual value. For instance, that the value of used cars taken in trades was posted on the books at the price paid for them, without regard to their actual or reasonable value. The bookkeeper further testified, in part:

"Q. Your fixed assets for $6,042.24, you testified they are not worth over $500.00? A. For quick sale, I doubt if you could get that. * * *

"Q. Are you still trying to collect these notes that you said were without any value? A. Certainly.

"Q. And you expect to collect most of them? A. I don't expect to collect $25.00 worth.

"Q. Even though conditions change and business comes back to normal? A. There is about $90.00 or $100.00 worth of notes and accounts I expect to collect if business comes back. There is about $1,800.00 or $2,000.00 I don't expect to collect. * * *

"Q. What? A. In 1931 the Company was not as substantial as it was in May of 1928 on account of the contingent liability and the general business conditions that existed.

"Q. How much difference do you think there was in the value of the assets, including all the assets? How much do you think the assets were worth at the time Mr. Kay left there? A. Well, we tried to sell the company and we were unable to do so.

"Q. That is because there was no market. What was it worth in your judgment? A. With the contingent liability hanging over our head?

"Q. Yes; just like it was. A. There was no worth to it.

"Q. It is your testimony, under oath, this stock wasn't worth anything when Mr. Kay left there? A. If we had to trade out for what the contingent liability was against the company, you could not find a purchaser, and that is what the market value would be determined by."

No attempt was made to contradict her testimony; no evidence of any kind was offered to show what, if any, contingent liabilities amounted, in fact, to actual liabilities. The contingent liabilities arising from indorsement of notes by the local corporation to the General Motors Acceptance Corporation amounted to $11,000 or $12,000. These were admittedly not included in the financial statement introduced by appellee and already referred to. Deducting this item alone from the net assets would leave the corporation bankrupt and this without regard to the loss in other assets. Whether all or none of these contingent liabilities could properly be deducted from the assets remains unproven. The burden was on appellee to prove the book value of the stock under the court's charge. The uncontradicted evidence is that the corporation could not be sold for anything due primarily to these contingent liabilities.

In the case of Succession of Warren, 162 La. 649, 110 So. 891, the court permitted the entire contingent liabilities to be deducted

from the assets under the particular facts of that case. In this case the court authorized a reduction by whatever amount of the contingent liabilities the jury might find would become actual. But, as pointed out above, no evidence was introduced by which a jury could make such calculation.

What has been said we think demonstrates that the jury's finding that the stock in question had a book value of $750 was without sufficient evidence to support it under the theory on which the case was tried.

Since this case must be reversed, we call attention to another phase of same not raised by appellant.

Without any pleadings alleging agency and authority, appellee proved that the daughter of appellant sold the stock for appellant to appellee and bound her to repurchase it at its book value. We gravely doubt that such authority may be implied from a mere agency to sell stock, as a repurchase agreement would not seem to be a necessary or usual incident of the mere power to sell. The finding that such authority existed seems to rest in this record upon such implication only. We mention this in view of another trial, without expressly passing on it.

Reversed and remanded.