389 P.2d 266

**AMERICAN SURETY COMPANY OF NEW YORK, Appellant,**

v.

**C. W. NASH, Appellee.**

No. 6996.

Supreme Court of Arizona,

En Banc.

Feb. 5, 1964.

Jennings, Strouss, Salmon & Trask, Phoenix, for appellant.

Joseph H. Morgan, Phoenix, for appellee.

UDALL, Chief Justice.

Appellee brought action in the Superior Court of Maricopa County to recover the sum of $23,950 representing damages sustained by reason of a wrongful writ of garnishment issued against him. Appellant was surety on the garnishment bond. Judgment was rendered against the surety. No Findings of Fact and Conclusions of Law were requested and none were made.

The essential facts brought out during the trial show that on June 16, 1954, D. W. Simpson purchased certain mercury mining claims located in Maricopa County, Arizona, together with the improvements and mining equipment thereon; the equipment, however, was not itemized in the contract.

The agreement further provided that the buyer could abandon the property.[1] The mining claims were later transferred to the International Ore Corporation, in which Simpson, Jesse H. Lochusen and Tom H. Donaldson owned all of the capital stock.

On May 23, 1955, the three stockholders pledged all their stock to appellee as security for a $25,000 loan he made to the corporation on the same day, which loan was evidenced by two notes for a total amount of $25,000 made payable to him on or before November 23, 1955. The stock was put in escrow with the agreement that if the notes executed for the loan were not paid when due the stock would be sold at public sale and the proceeds applied first on the indebtedness due the appellee, the balance, if any, being paid the stockholders.

The notes were not paid when due; on November 23, 1955, or shortly thereafter, appellee made demand upon the escrow holder to sell the stock. The demand was refused because on or before that same day International Ore Corporation commenced an action in the Superior Court against appellee and others seeking damages of $26,000 for an alleged breach of contract. In connection with the action, International Ore caused two writs of garnishment to be

---

1. "Should the buyer decide to abandon the property he shall leave the same in a safe condition and shall not remove any permanent improvements therefrom, or remove anything that will leave the mine in an unsafe or dangerous condition, and will pay or cause to be paid all royalties that may be due at time of the abandonment of the property." (Contract of Sale.) There was no prohibition in the contract against removal of the mining equipment by the purchaser.

issued and served, one on the escrow holder and the other against itself; and it posted bond in the principal sum of $26,000 upon which the appellant was surety.

On June 26, 1957, judgment was rendered in favor of appellee in the action brought by the corporation. The stock was ordered sold at public sale in August of 1957, pursuant to the terms of the escrow agreement. Appellee, being the only bidder, purchased the stock for $50. Later, when execution was issued on the assets of International Ore Corporation only a few remaining mining claims were offered for sale. Appellee made a "token bid" of $2,000.[2] These two sums were credited on the $26,000 bond obligation, leaving a balance due on the indebtedness of $23,950.

It was argued at the trial that by virtue of the wrongful garnishment appellee was prevented from having the stock sold as provided under the terms of the pledge agreement, and he was unable to take possession of the property owned by International Ore Corporation if the stock did not sell for the amount of the notes. Further, it was contended by appellee that the corporation at the time payment was due had ample property out of which recovery could have been realized.

Appellant admits that the writs of garnishment were wrongful but claims that under the pleadings and the evidence the appellee can recover no more than nominal damages. In support of this position it makes three assignments of error:

1. Appellee failed to prove he suffered any damages as a result of the wrongful garnishment.

2. Evidence that appellee would have been able to operate the claims and make a profit was not within the scope of the pleadings and it was speculative and conjectural. Therefore, it was improperly admitted.

3. The court erred in allowing appellee to testify as to his recollection of an assayer's report upon 50,000 tons of dump material.

With regard to the first assignment of error appellee alleged inter alia in his complaint:

"That by virtue of the issuance and service of said Writ of Garnishment, which impounded in the hands of INTERNATIONAL ORE CORPORATION the claims and amounts due from it to the plaintiff, C. W. NASH, and his co-plaintiff above named, RALPH W. RICH, they were unable to attach or levy upon any property then owned by INTERNATIONAL ORE CORPORATION and out of

2. Mr. Morgan testified, "the only property that could be levied on at that time was

some claims that had been located by the International Ore, mining claims."

which recovery might be had when and if judgment was entered for the recovery of the C. W. NASH notes. No such action was available until it was determined, in Cause No. 86360, that the claims of INTERNATIONAL ORE CORPORATION were without merit and that the garnishment secured by the bond of the defendant in such action was wrongful.

"At the time of the filing and service of said Writ of Garnishment, and upon the date of the garnishment bond issued by the defendant in said action, INTERNATIONAL ORE CORPORATION had ample property out of which recovery could have been made on plaintiffs' notes."

Appellant contends that garnishment of the stock in the hands of the escrow in nowise affected appellee's right to bring suit against International Ore, attach the assets and levy execution after judgment. This argument ignores the thrust of the complaint; for the $25,000 debt, as well as the stock, was garnished in the hands of the debtor—the corporation itself. He could not proceed against the corporation on the notes for the reason that the indebtedness to him was held in abeyance pending the disposition of the suit by International Ore. Gillespie Land & Irrigation Co. v. Jones, 63 Ariz. 535, 164 P.2d 456 (1945). Furthermore, had he been able to pursue the debt to judgment, no execution and

sale in satisfaction thereof would have been possible. A.R.S. § 12–1578 provides: "From and after the service of a writ of garnishment, the garnishee shall not pay to defendant any debt or deliver to him any property * * *." The fact that both the debt and the security were garnished left appellee completely powerless to realize on his claim or prevent it from becoming worthless while the writs remained in force.

Proof that the debtor corporation became insolvent, or could no longer pay the debt after collection was delayed by the wrongful garnishment, would therefore justify recovery on the bond. American Surety Co. v. Florida Nat. Bank & Trust Co., 94 F.2d 126 (5th Cir.1938); Taylor v. Wilbur, 170 Wash. 265, 16 P.2d 457 (1932). Such proof would, of course, have to be accompanied by evidence that the stock by which the debt was secured had also declined in value. But both the debtor's inability to pay and the depreciation of the stock could be established by comparison of the corporation's worth in 1955 with its worth in 1957 when the garnishment was finally discharged. See In re Frank's Estate, 123 Or. 286, 261 P. 893, 57 A.L.R. 1155 (1927) to the effect that the "book value" of stock in a close corporation is prima facie evidence of its value. Cf., American Surety Co. v. Duvall, 22 Ariz. 261, 196 P. 457 (1921); Wineinger v. Kay, 58 S.W.2d 876 (Tex.Civ.App.1933).

At trial testimony was offered by the appellee which tended to establish the existence and value of property and equipment on the premises of the mine at the time of the wrongful garnishment. Merton I. Root, a maintenance and mill operator employed by International Ore Corporation testified concerning a large number of items of equipment placed on the premises by Mr. Simpson and International Ore. Listed among these items were two 1955 Chevrolet pickup trucks; a new Caterpillar power plant; a crusher, rebuilt at a cost of $1150; an air tugger or hoist; a retort that was built under his supervision; [3] two one-ton chain hoists; a large assortment of tools and miscellany used in the mining operation including jack hammers, electric drills, welding equipment, wrench sets, tap and dies, drafting tools, etc.

The evidence indicates that the two new pickup trucks and the Caterpillar power plant were being purchased under contract. The record is silent as to the equity which International Ore had in the two trucks but it does show that International Ore had an equity, at the time of the loan, of $2,000 in the power plant. The record does not disclose that there were any other liens or encumbrances on any of the property. International Ore failed to make the payments on the Caterpillar power plant after the

garnishment was served, although the power plant remained in its possession for nearly a year, and as a result of the garnishment the $2,000 equity was lost as an asset of International Ore.

Mr. Paul R. Corwin, an employee and overseer of International Ore's operation, testified as to the value of the equipment on the mining premises as of October 19, 1955 as follows:

"Q  How much experience have you had in mining?

"A  Twelve years

"Q  You have purchased mining equipment, I presume, during that time?

"A  I have.

"Q  Would you be able to state what the value of that equipment that you have listed was as of October, 1955?

"A  Completely installed where it was located, I would say in the neighborhood of $100,000. Of course, the cost of the units themselves in Phoenix or Los Angeles would be different altogether. If you are asking for the complete installation of each setup there, I would say in the neighborhood of $100,000."

3. In connection with his testimony concerning the retort he stated that the International Ore expended approximately $2,000 on the material that went into the rebuilding of the retort and approximately $800 to $900 in labor.

Appellee Nash, a civil engineer with 16 years mining experience, testified as to some of the assets at the mine and the replacement value of some of the equipment that was removed or left in virtual ruin after the writs of garnishment issued. He stated: "It would have required $13,000 to replace the portable equipment. It would have required $7500, at a minimum, to restore the machinery and building so that they could be used, and $3,000 to replace the equipment in the camp to house the workmen."

■ On the question of value the facts show that the stockholders invested $200,000 in this mining venture, for which they asserted a claim against the corporation, after they acquired the property in the summer of 1954, and that the mining enterprise was a going concern up until about the first of November, 1955; that for the month of September, 1955, twenty-two flasks of mercury were produced having a value of $5,500. For the month of October, fourteen flasks had been produced of a value of $4,480. About 40 to 45 tons of ore were being mined each day and sent to the mill. Besides indicating the corporation's substantial value as a going concern, this evidence bolsters the testimony relating to the value of the mining equipment and other personal property then on the premises.[4]

■ Admittedly, the replacement value, or the value of the equipment as an integrated portion of the mining operation may have been greater than any amount appellee could have realized on a sale of the assets. Nevertheless, we think the evidence of value was sufficient to justify a finding by the trial court that the $25,000 debt could have been fully satisfied.

■■ The question was raised at trial whether the evidence established that the equipment was owned by International Ore. As we have seen, the trucks and power plant were being purchased on contract.

---

4. The general principle recognizing this type of value was stated in Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949):
   "The value of all property, * * * is dependent upon and inseparable from individual needs and attitudes, and these, obviously, are intangible. As fixed by the market, value is no more than a summary expression of forecasts that the needs and attitudes which made up demand in the past will have their counterparts in the future. * * * The only distinction to be made, therefore, between the attitudes which generate going-concern value and those of which tangi-ble property is compounded is as to the tenacity of the past's hold upon the future: in the case of the latter a forecast of future demand can usually be made with greater certainty, for it is more probable on the whole that people will continue to want particular goods or services than that they will continue to look to a particular supplier of them. * * * But as the probability of continued patronage gains strength, this distinction becomes obliterated, and the intangible acquires a value to a potential purchaser no different from the value of the business's physical property."

We believe, however, that the trial court could have concluded that the other equipment was corporate property. There is no doubt that International Ore had exclusive possession. Unless explained or qualified, such possession is *prima facie* proof of ownership. Starkweather v. Conner, 44 Ariz. 369, 38 P.2d 311 (1934). Ownership was thus a question of fact and the finding will not be disturbed on appeal.

Appellant argues that no evidence was introduced which would show that the corporate assets, in 1955, exceeded the liabilities. We disagree. It was clearly established that the stockholders' $200,000 claim was subrogated in favor of appellee. An audit of the corporate books at the time the loan was negotiated shows an indebtedness of approximately $26,000 and the appellee testified that after the loan was made "all of the current debts of the corporation were paid up to that date."

The appellant asserts that its agent reported, on the 19th of October 1955, that payroll checks should have been made on the 17th to the 14 men working at the mine and that the payments had not been made on the 18th. Further, it appears that Mr. Corwin had two of his paychecks dishonored. This evidence, however, does not in any way show that the payroll and other operational debts were not fully paid. Appellant argues that International Ore was in very bad financial condition in September, October, and November, 1955. It was at this very time, however, that the corporation showed so much faith in the financial structure of the mining property that it filed a suit against the appellee and had the writ of garnishment served to prevent the appellee from getting possession of the mining claims and mining equipment.

Even assuming that the October 17 payroll was not met, and that the two dishonored checks were not paid, their total would be an infinitesimal liability compared to the value of the assets of International Ore Corporation placed at $100,000 or more at the time the writ of garnishment was served.

■ The record does not disclose that any other debts were incurred by International Ore between the date of the loan and the date the writ of garnishment was served. The burden, of course, was on appellee to establish that the assets exceeded the liabilities, but we think that the foregoing evidence was enough to support a conclusion that the net worth of the corporation was substantial and far in excess of appellee's claim.

Another fact that must be considered before the case can be disposed of is the question of what became of the mining equipment and personal property that was located on the site. Mr. Root testified that when he and Mr. Morgan went to the mine on the 8th of August, 1957, "the only thing that was there was the crusher that had been

repaired; it was still there \* \* \* and the refrigerator and these two beds—the air tugger and the Caterpillar diesel electric plant, and everything was all gone." Mr. Joseph Morgan corroborated his testimony as follows: "We went \* \* \* [to the mine in August of 1957] \* \* \* we found that all or practically all of the machinery and equipment had been removed from that property, and that there was very—practically no machinery and equipment there, and that the mine was in very bad shape."

The garnishment bond executed by the appellant provided that the American Surety Co. of New York

"[acknowledged itself] bound to pay to C. W. Nash, Defendant, the sum of $26,000, conditioned that the above-bounden International Ore Corporation, plaintiff in the above entitled cause, will prosecute its suit to effect and will pay all damages and costs that may be sustained by the defendant by reason of the wrongful suing out of said garnishment."

■ The appellant frankly acknowledges that the suing out of the garnishment was wrongful. The law clearly holds that any damages accruing to the defendant in a garnishment action that naturally flow from the wrongful suing out of the writ are recoverable to the extent of the damages shown, not exceeding the amount of the bond executed by the surety. A.R.S. § 12–

1572; De Wulf v. Bissell, 83 Ariz. 68, 316 P.2d 492 (1957).

■ In a case tried to the court in which no request for findings of fact is made, the judgment will be upheld, if possible, on any theory within the issues and supported by the evidence. Julian v. Carpenter, 65 Ariz. 157, 176 P.2d 693 (1947).

■ We conclude that the evidence taken in its strongest light shows that if the appellee could have enforced the terms of his agreement with the stockholders and immediately after the default of payment had the stock sold, the stock would probably have brought enough to pay the indebtedness due the appellee. If at the time of the sale of the stock the appellee had become the purchaser at the amount of or less than his claim he could have obtained immediate possession of the mining equipment and personal property then located on the mining premises. We further conclude that had the appellee acquired the stock at that time, under the terms of the agreement there was sufficient mining equipment and personal property at the mine at the time of the wrongful garnishment, that belonged to International Ore, out of which appellee could have satisfied his claim based on the promissory notes for $25,000.

"A judgment will not be disturbed when there is any reasonable evidence to support it." Patzman v. Marshall, 90 Ariz. 1, 363 P.2d 599 (1961).

Since we have approved the ruling of the trial court with reference to the first assignment of error, we do not find it necessary to rule on the questions raised by the other assignments.

Judgment affirmed.

BERNSTEIN, J., and CHARLES C. STIDHAM, Superior Court Judge, concurring.

NOTE: Vice Chief Justice LOCKWOOD and Justice JENNINGS having announced their disqualification, the Honorable WILLIAM W. NABOURS, Judge of Superior Court, Yuma County, and the Honorable CHARLES C. STIDHAM, Judge of Superior Court, Maricopa County, were called to sit in their stead.

CHARLES C. NABOURS, Judge of Superior Court (dissenting).

I must dissent from the conclusion reached by the majority in this case.

As stated by the majority, the basis of the appellee's complaint was the allegations:

"That by virtue of the issuance and service of said Writ of Garnishment * * * they were unable to attach or levy upon any property then owned by INTERNATIONAL ORE CORPORATION and out of which recovery might be had when and if judgment was entered for the recovery of the C. W. NASH notes. No such action was available until it was determined, * * * that the claims of INTERNATIONAL ORE CORPORATION were without merit and that the garnishment secured by the bond of the defendant in such action was wrongful.

"At the time of the filing and service of said Writ of Garnishment, and upon the date of the garnishment bond issued by the defendant in said action, INTERNATIONAL ORE CORPORATION had ample property out of which recovery could have been made on plaintiffs' notes."

I disagree with the statement of the majority that the appellee herein, Nash, was prevented from attaching any property owned by International Ore Company in the event he filed suit as the garnishment provision goes only to property owned by the debtor and not to property of the garnishee. The authority cited adds no light to that conclusion. However, this point has no bearing upon the issues involved as Nash had no obligation to attach regardless of whether he was or was not able to do so and his failure to do so imposes no limitation upon his right to recover.

The loans made by Nash were secured by the stock pledged by the only three stockholders of the corporation. Nash neither requested nor secured a chattel mortgage

upon any of the property then owned by the corporation or to be purchased by it in the future. He was apparently satisfied that the stock was of ample value to protect his loans. When the notes were not paid Nash made a demand upon the escrow holder to sell the stock according to the provisions of the pledge agreement. This could not be done as the writs of garnishment had been issued, one to the escrow holder, the other to the corporation.

If the writs of garnishment had not been served and the escrow holder had offered the stock for sale in accordance with the pledge agreement, Nash would have been able to purchase the stock for an unknown amount or would have received the proceeds of the sale in the event of the purchase thereof by another. At the trial the possibility of any other person buying the stock was completely ignored and the case presented upon two theories. One, that by buying the stock Nash would have become the sole owner of the corporation and would have owned all of its assets, thereby recovering the amount of his loans. The other, that by becoming the sole stockholder he could take over the operation of the mine and by the profit to be made from the operation eventually recover his loss. This latter theory was strenuously objected to by the defendant but was allowed by the trial court which accepted evidence thereon.

In allowing evidence upon this theory the court was in error. However, in view of the fact that the majority did not consider that assignment of error, it will not be considered in this dissent except for one point which will be brought out later.

Under either theory presented at the trial, the appellee failed to sustain the burden of proof required to support the judgment.

A review of the transcript clearly shows that there was no evidence presented to prove that any property upon the mining claim was the property of the corporation other than the caterpillar tractor which was used as a power unit and which was purchased on a contract. The evidence clearly showed that the contract was in default, that $4,498.26 was due, and the condition of the machine was unknown. While there may have been a $2,000.00 equity in the machine by virtue of money paid, there can be no finding of such in the absence of testimony concerning the condition of the machine and the market value of a used machine at that time in that location. The other items listed by the majority were never connected to International Ore as owner except by speculation. The best evidence of this is from the reporter's transcript wherein the trial judge stated:

"Well, what I can't understand is, there has been no testimony what-

282

ever as to who owned that equipment at all.

\* \* \* \* \* \*

"There have been surmises, but no direct testimony \* \* \*.

\* \* \* \* \* \*

" \* \* \* he didn't know anything about the ownership; he saw the property there; \* \* \*.

\* \* \* \* \* \*

"—but as to the rest of the property, he didn't know whether it was owned or leased or what it was. I am sure he testified that."

During this same period counsel for Nash stated:

"The testimony of Root is that this particular property was *placed* on there by the International Ore." (Emphasis supplied.)

The Court replied:

"That is right, but maybe it belong to somebody else. I imagine mining equipment of that kind can be rented."

There was absolutely no differentiation made between an installed cost and a market value of personal property. The mine did not belong to International Ore, it was on purchase agreement which was in default. Any property attached to the realty was certainly not available to Nash unless he became the purchaser of the mine. These facts, coupled with the lack of proof of ownership fall far short of proof by a preponderance of the evidence.

Should Nash have become the sole owner of the pledged stock, he would not have been entitled to all of the property of the corporation free and clear of any liabilities. This property did not belong to the individual, it belonged to the corporation. Creditors of the corporation could not be ignored nor could its liabilities be pushed aside. Nash had no lien on or prior right to the assets of the corporation. All that he had was the stock. Therefore, in order to determine the results of the wrongful garnishment, we must know what the value of the stock was at the time the writs were served as compared to the value at the time the stock was finally sold. Knowing what the assets of the corporation were is of no value standing alone. Appellee recognized this principle when he stated in his brief that

"It is obvious from this, [the pledge agreement] that the corporation knew, and the surety on the Appellant's bond also knew, that, if the stock was not sold for a sufficient amount to satisfy Mr. Nash's loan, the stock would be bought in by him and he would then have full control of all the corporate assets."

He would also have the full obligation of all the corporate liabilities. Therefore, in order to ascertain the damages recoverable

directly and proximately resulting from the seizing or impounding of the property in the hands of the garnishee we must determine the value of that which was garnished, to-wit, the stock. The testimony was uncontradicted that the stock had no market value at the time that it was pledged and had no market value at the time it was sold. The value of corporate stock which has no market value must be determined by a comparison of its assets and liabilities. American Surety Company v. Duvall, 22 Ariz. 261, 196 P. 457; Tevis v. Ryan, 13 Ariz. 120, 108 P. 461. Appellee chose not to follow this well-accepted principle, and offered no proof as to the assets and liabilities of the corporation other than the broad statements heretofore pointed out which were without foundation. The majority state that proof would have to be offered to show that the stock had declined in value. This proof was not made. The assets listed by the majority did not prove value. For example, they state that there were two new pickup trucks placed on the premises by Mr. Simpson and International Ore. No evidence was presented as to title. Was it in Simpson or the corporation? No evidence was shown as to the value of the trucks, whether they were clear or encumbered. If the power plant was heavily mortgaged, it could be assumed that all the other equipment was also mortgaged. Its value then was pure speculation. The very weakest testimony, and that relied on by the majority, was the quoted answer of Mr. Corwin, to-wit:

"Completely installed where it was located, I would say in the neighborhood of $100,000. Of course, the cost of the units themselves in Phoenix or Los Angeles would be different altogether. If you are asking for the complete installation of each set-up there, I would say in the neighborhood of $100,000."

This testimony, as admitted by the majority, had little value. They merely conclude that it was sufficient to return $25,000.00. The testimony clearly revealed that by far the greatest part of this estimate on value was connected not with saleable items of personal property but were in relation to permanent improvements that were of value only in the operation of the mine, such as the mill, the kiln, a rebuilt crusher and retort, all repaired or rebuilt. While these items might well make up the overall value of the mine as an operating unit, there was no testimony of value upon a forced sale. This was the primary part of the figure of $100,000.00. An installed price is not the proper way to fix value unless it is directly related to the value of the corporate assets which would then be reflected in the value of the stock. This not being done, the testimony has no value.

The crux of the entire matter lies in the undisputed testimony that the stock had no value. The value of a corporation is reflected in the value of its stock. Here it was the stock that was pledged, it was the stock that was garnished. The evidence conclusively shows that the stock had the same value at the time that it was sold as it had at the time it was garnished. There being no diminution in the value, there has been no showing of damages from the wrongful garnishment.

At the trial of this action, the plaintiff in effect abandoned the theory of tangible assets and proceeded upon the basis that his damages arose from his being prohibited from gaining control of all of the capital stock of the corporation which had been pledged and was in the hands of the escrow holder. That, if he had been allowed to compel the escrow holder to sell the pledged stock, and if he had been the purchaser at the sale, he would have been able to recover his $25,000.00 from the operation of the mine. This testimony was allowed by the Court over the objections of the appellant.

The plaintiff was allowed to testify as to the amount of money he could have made by operating the mine if he had been able to purchase the stock at the time his notes became due. In fact, he testified that this was his intention, and was his proposed method of recovering his $25,000.00 loan. In connection with this testimony he was allowed to state the findings of an assayer which had been contained in a lost report. It was error to admit such testimony as it vitally concerned the testimony as to the profits that could have been made from the operation of the mine and mill; it constituted reversible error. However, even with such testimony the plaintiff failed to show damages other than those based upon speculation and conjecture.

It is plain that the judgment entered herein was not based upon proved damages flowing naturally from the wrongful garnishment.

It is my considered opinion that the majority in this case are allowing a judgment based upon speculation and conjecture to stand. This is not the law and will only serve to confuse the question when presented to a trial court. I believe the case should be reversed and remanded for further proceedings.

STRUCKMEYER, J., concurs in this dissent.